Versión para imprimir



| | |
|---|---|
| Sindicato de Bomberos Unidos de Puerto Rico<br><br>        Recurrida<br><br><br>        v.<br><br><br>Cuerpo de Bomberos de Puerto Rico; Pedro Vázquez Montañéz, Jefe de Bomberos Interno; Estado Libre Asociado de Puerto Rico; Guillermo Somoza, Secretario de Justicia<br>        Peticionarios | |
| Servidores Públicos Unidos de Puerto Rico/AFSCME; Concilio 95 en representación de sus Unionados<br>        Recurridos<br><br><br>        v.<br><br><br>Estado Libre Asociado de Puerto Rico; Departamento de Educación, et als.<br>        Peticionarios | 2011 TSPR 12<br><br>180 DPR \_\_\_\_ |
| Federación Central de Trabajadores<br>        Recurrida<br><br><br>        v.<br><br><br>Departamento de Vivienda; Departamento de Recreación y Deportes; Estado Libre Asociado de Puerto Rico<br>        Peticionarios | |

Número del Caso: CT-2010-0001
                 CT-2010-0002
                 AC-2010-0018

Fecha: 26 de enero de 2011


Abogados de la Parte Peticionaria:

Lcdo. Eliezer Aldarondo Ortiz
Lcda. Rosa Campos Silva
Lcda. Sheila Torres Delgado
Lcdo. Simone Cataldi Malpica
Lcdo. Eliezer Aldarondo López

Abogadas de la Parte Recurrida/Apelada:

Lcda. Leonor Rodríguez Rodríguez
Lcda. Amalis Torres González

Abogada de Servidores Públicos
Unidos de Puerto Rico:

Lcda. Celina Romany


Materia: Certificación


Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Sindicato de Bomberos Unidos de Puerto Rico<br>Recurrida<br><br>v.<br><br>Cuerpo de Bomberos de Puerto Rico; Pedro Vázquez Montáñez, Jefe de Bomberos Interino; Estado Libre Asociado de Puerto Rico; Guillermo Somoza, Secretario de Justicia<br>Peticionarios<br>Servidores Públicos Unidos de Puerto Rico/AFSCME; Concilio 95 en representación de sus Unionados<br>Recurridos<br><br>v.<br><br>Estado Libre Asociado de Puerto Rico; Departamento de Educación, *et als*.<br>Peticionarios<br>Federación Central de Trabajadores<br>Recurrida<br><br>v.<br><br>Departamento de Vivienda; Departamento de Recreación y Deportes; Estado Libre Asociado de Puerto Rico<br>Peticionarios | CT-2010-0001<br>CT-2010-0002<br>AC-2010-0018 |

Opinión del Tribunal emitida por el Juez Asociado señor Rivera García

San Juan, Puerto Rico, a 26 de enero de 2011.

Mediante los recursos aquí consolidados se nos solicita que declaremos la inconstitucionalidad de la Ley Núm. 7 de 9 de marzo de 2009, según enmendada, conocida como Ley Especial Declarando Estado de Emergencia Fiscal y Estableciendo Plan Integral de Estabilización Fiscal para

Salvar el Crédito de Puerto Rico. Los referidos petitorios, en gran medida, reproducen los mismos planteamientos esbozados y ya adjudicados en Domínguez Castro, et als. v. E.L.A. I, et als., 2010 T.S.P.R. 11, 178 D.P.R. ___ (2010) certiorari denegado, Castro v. Puerto Rico, 131 S.Ct. 152, 562 U.S. ___ (2010). Así también, se aducen razones adicionales por las cuales se debe declarar inconstitucional la Ley Núm. 7, supra. Asimismo, nos solicitan que decretemos la nulidad de las cartas de antigüedad y cesantías remitidas por los peticionarios y que ordenemos la reinstalación inmediata de los empleados cesanteados. Veamos.

## I. CT-2010-0001

El 26 de enero de 2010, el Sindicato de Bomberos Unidos de Puerto Rico,[1] en adelante SBUPR, presentó ante el Tribunal de Primera Instancia una demanda sobre sentencia declaratoria e interdicto preliminar y permanente en contra del Cuerpo de Bomberos de Puerto Rico; Sr. Pedro A. Vázquez Montañez, Jefe de Bomberos Interino; Estado Libre Asociado de Puerto Rico; y Guillermo Somoza, Secretario de Justicia.[2] En específico, el SBUPR alegó que el 28 de diciembre de 2009 le notificaron por correo certificado las copias de las cartas de cesantías que les fueron

---

[1] Conforme la Certificación Número 037 de 2 de diciembre de 2002, emitida por la Comisión de Relaciones del Trabajo del Servicio Público, en adelante CRTSP, el Sindicato de Bomberos Unidos de Puerto Rico es el representante exclusivo de todos los empleados administrativos y de mantenimiento del Cuerpo de Bomberos de Puerto Rico.

[2] Véase, Apéndice del Recurso de Certificación CT-2010-0001, págs. 1-22.

remitidas, en esa misma fecha, a algunos de sus miembros. Añadió que dichas misivas informaron que las cesantías de sus miembros serían efectivas el 29 de enero de 2010, con excepción de uno (1) de ellos cuya fecha de cesantía sería efectiva el 19 de enero de 2010.[3] Asimismo, el SBUPR adujo que las comunicaciones de cesantías antes descritas eran nulas porque fueron firmadas por una persona sin capacidad jurídica para ello, el Sr. Pedro A. Vázquez Montañez, Jefe de Bomberos Interino,[4] y que la Ley. Núm. 7, *supra*, era inconstitucional por haber sido aprobada en violación a la Sección 17 del Artículo III de la Constitución de Puerto Rico.[5]

Consecuentemente, el SBUPR razonó que las referidas cartas de cesantías fueron notificadas en detrimento del principio de simultaneidad contenido en el Artículo 37.04(b) de la Ley Núm. 7, *supra*, pues sus miembros no fueron informados de sus cesantías en la misma fecha. Ello implica, alegadamente, que las cesantías anunciadas no entraron en vigor y que todo el procedimiento era nulo.[6] Concluyó, además, que las cartas de cesantía eran nulas

---

[3] *Íd.,* págs. 2-3, 7-9.

[4] *Íd.,* pág. 8.

[5] *Íd.,* pág. 21. Además, al igual que en Domínguez Castro, *et als.* v. E.L.A. I, *et als.*, 2010 T.S.P.R. 11, 178 D.P.R. ___ (2010) *certiorari denegado*, Castro v. Puerto Rico, 131 S.Ct. 152, 562 U.S. ___ (2010), el SBUPR alegó en su demanda que el no haber celebrado una vista previo a decretar las cesantías violaba los derechos constitucionales de sus miembros; que la delegación de poderes a la Junta de Reestructuración y Estabilidad Fiscal, en adelante JREF, era excesiva; y que las disposiciones de la Ley Núm. 7, *supra*, menoscaban las obligaciones contractuales. Por ello concluyó, entre otras cosas, que dicho estatuto es inconstitucional. *Véase*, Apéndice del Recurso de Certificación CT-2010-0001, págs. 2, 8-22.

[6] *Véase*, Apéndice del Recurso de Certificación CT-2010-0001, págs. 7-9.

porque el señor Vázquez Montañez no había sido designado o nombrado por el Gobernador de Puerto Rico, ni confirmado por el Senado de Puerto Rico, para actuar como Jefe de Bomberos Interino, ejercer tales funciones y mucho menos emitir las referidas misivas.[7] Asimismo, el SBUPR coligió que la Ley Núm. 7, *supra*, era inconstitucional debido a que involucra más de un asunto y contiene materias incongruentes entre sí, en violación de la Sección 17 del Artículo III de la Constitución de Puerto Rico.[8]

El 9 de febrero de 2010, el Estado presentó un recurso de certificación ante este Tribunal acompañado por una moción en auxilio de jurisdicción. En ambos recursos, aparte de indicar que la mayoría de las alegaciones vertidas en la demanda presentada por SBUPR ya habían sido adjudicadas en Domínguez Castro, *et als*. v. E.L.A. I, *et als.*, *supra*, el Estado argumentó que las controversias no resueltas, ahora ante la consideración del Tribunal de Primera Instancia, estaban revestidas de un gran interés público y que debían ser atendidas por este Tribunal. Al día siguiente, 10 de febrero de 2010, emitimos una resolución en la cual ordenamos la paralización de los procedimientos ante el foro primario y expedimos el recurso de certificación.

---

[7] *Íd.*, pág. 8.

[8] *Íd.*, pág. 21.

**II. CT-2010-0002**

El 5 de enero de 2010, la organización sindical Servidores Públicos Unidos de Puerto Rico / AFSCME, Concilio 95, en adelante SPU,[9] presentó una demanda ante el Tribunal de Primera Instancia sobre sentencia declaratoria e interdicto preliminar y permanente en contra del Estado Libre Asociado de Puerto Rico; Departamento de Educación, por conducto de su otrora Secretaria la Sra. Odette Piñeiro; Departamento de la Familia, por conducto de su Secretaria la Lcda. Yanitsia Irizarry Méndez; Administración para el Sustento de Menores, por conducto de su Administrador el Lcdo. Waddy Mercado Maldonado; Departamento de Transportación y Obras Públicas, por conducto de su Secretario el Sr. Rubén Hernández Gregorat; y el Departamento de Recursos Naturales y Ambientales, por conducto de su Secretario el Sr. Daniel Galán Kercadó. En ella, la SPU alegó que los codemandados incumplieron con las exigencias de notificación establecidas por el Artículo 37.04(b), incisos 2, 3, 7, 9, 11 y 15, de la Ley Núm. 7, *supra*, debido a que las cartas de cesantía enviadas a algunos de sus miembros fueron notificadas con menos de treinta (30) días calendario de antelación a la

---

[9] La SPU es una organización sindical que agrupa empleados de diferentes agencias del gobierno central y en las cuales es el representante exclusivo según certificada por la CRTSP por virtud de la Ley Núm. 45 de 25 de febrero de 1998, según enmendada, conocida como Ley de Relaciones del Trabajo para el Servicio Público. *Véase*, Apéndice del Recurso de Certificación CT-2010-0002, pág. 2.

fecha de su efectividad y que a otros miembros no se les notificó carta de cesantía alguna.[10]

A su vez, la SPU adujo que la Ley Núm. 7, *supra*, fue aprobada en abierta violación a la Sección 17 del Artículo III de la Constitución de Puerto Rico, la cual prohíbe que se apruebe una ley que contenga más de un solo asunto. Además, indicó que el resultado de dicha aprobación fue "una ley incongruente que combina legislación sobre materias y que derogan una serie de de [sic] leyes, reglamentos y políticas públicas establecidas, especialmente cuando ha desmantelado *de facto* agencias cuyas políticas públicas expresamente consignadas en estatutos no han sido oficialmente derogadas".[11]

Consecuentemente, la SPU razonó que sus miembros, notificados o no de sus cesantías, se encuentran en un estado de indefensión y que se les ha privado de un interés propietario en abierta violación al debido proceso de ley y al procedimiento establecido en el Artículo 37.04(b) de la Ley Núm. 7, *supra*.[12] Por ello solicitó la celebración de una vista en donde se dirimiera la expedición de un interdicto ordenándoles a los demandados

---

[10] *Véase*, Apéndice del Recurso de Certificación CT-2010-0002 págs. 85-88.

[11] *Íd*, pág. 85. Además, al igual que en Domínguez Castro, *et als.* v. E.L.A. I, *et als.*, *supra*, la SPU alegó en su demanda que la Ley Núm. 7, *supra*, era inconstitucional debido a que violaba el debido proceso de ley, menoscababa las obligaciones contractuales del Estado y contemplaba una delegación de poderes excesiva a la JREF. Todo ello motivado por un "supuesto" estado de emergencia fiscal. Por ello concluyó que dicho estatuto es inconstitucional. *Véase*, Apéndice del Recurso de Certificación CT-2010-0002, págs. 77-85.

[12] *Véase*, Apéndice del Recurso de Certificación CT-2010-0002, pág. 88.

a abstenerse de cesantear a los empleados que ella representa.[13] Solicitó, además, que se declarara la inconstitucionalidad de la Ley Núm. 7, *supra*, por haber sido aprobada en violación a la Sección 17 del Artículo III de la Constitución de Puerto Rico.

Luego de varios trámites procesales, el 22 de febrero de 2010, el Tribunal de Primera Instancia emitió una orden. En ella el foro primario indicó que celebraría una vista el 11 de marzo de 2010 para dilucidar la procedencia del recurso extraordinario solicitado por la SPU.

Así las cosas, el 10 de marzo de 2010, el Estado presentó ante este Tribunal un recurso de certificación acompañado por una moción urgente al amparo de la Regla 28 del Reglamento de este Tribunal. A parte de indicar que la mayoría de las alegaciones vertidas en la demanda presentada por SPU ya habían sido adjudicadas en Domínguez Castro, *et als.* v. E.L.A. I, *et als.*, *supra*, el Estado argumentó en ambos recursos, nuevamente, que el alto interés público que revisten las controversias ante la consideración del Tribunal de Primera Instancia, las cuales no fueron resueltas por el caso antes mencionado, amerita la atención de este Tribunal. Ese mismo día emitimos una resolución en la cual ordenamos la

---

[13] *Íd.* Además, al igual que en Domínguez Castro, *et als.* v. E.L.A. I, *et als.*, *supra*, el SPU solicitó que se declarara la inconstitucionalidad de la Ley Núm. 7, *supra*, por autorizar a la JREF a efectuar cesantías que menoscababan las obligaciones contractuales del Estado; por autorizar una delegación de poderes excesiva e indebida a la JREF; y por violar el debido proceso de ley sustantivo y el derecho fundamental al trabajo. *Véase*, Apéndice del Recurso de Certificación CT-2010-0002, págs. 88-89.

paralización de los procedimientos en el foro primario y expedimos el recurso de certificación.[14]

### III. AC-2010-0018

El 5 de noviembre de 2009, la Federación Central de Trabajadores, en adelante FCT,[15] presentó una demanda sobre interdicto preliminar y permanente ante el Tribunal de Primera Instancia en contra del Departamento de la Vivienda; Departamento de Recreación y Deportes; y el Estado Libre Asociado de Puerto Rico.[16] En ella adujo que las notificaciones de cesantía cursadas a los miembros que representa en la acción de autos eran defectuosas.

En específico, y en cuanto a los empleados del Departamento de la Vivienda, la FCT alegó que durante los días 25 a 30 de septiembre de 2009 dicha agencia le cursó una carta a varios de sus empleados notificándoles de sus respectivas cesantías[17] y que no fue hasta el 5 de octubre de 2009 que, por conducto de su secretario-tesorero, el Sr. Andrés Lloret, fue notificada personalmente de estos despidos. Esta notificación personal, añadió la FCT,

---

[14] El 21 de septiembre de 2010, emitimos una resolución mediante la cual ordenamos la consolidación de los dos (2) recursos de certificación presentados por el Estado, CT-2010-0001 y CT-2010-0002, debido a que ambos recursos presentan cuestiones comunes de derecho. 32 L.P.R.A. Ap. V, R.38.1.

[15] En virtud de la Ley Núm. 45, *supra*, la Federación Central de Trabajadores es una organización sindical legítimamente constituida que representa a empleados del sector público del gobierno de Puerto Rico. Entre estos se encuentran aquellos empleados comprendidos en las unidades apropiadas, certificadas por la Comisión de Relaciones del Trabajo del Servicio Público, en el Departamento de la Vivienda y en el Departamento de Recreación y Deportes. *Véase*, Apéndice del Recurso de Certiorari AC-2010-0018, pág. 93.

[16] *Véase*, Apéndice del Recurso de Certiorari AC-2010-0018, págs. 1-7.

[17] Varias de estas cesantías entrarían en efecto el 6 de noviembre de 2009 y el restante el 8 de enero de 2010. *Véase*, Apéndice del Recurso de Certiorari AC-2010-0018, págs. 94, 265.

consistió en la entrega de un expediente que contenía copia de las cartas de cesantía enviadas a los empleados.[18]

De igual forma, en cuanto a los empleados del Departamento de Recreación y Deportes, la FCT alegó que durante los días 25 de septiembre de 2009 a 1 de octubre de 2009 dicha agencia le notificó a varios de sus empleados, también mediante comunicación escrita, sus respectivas cartas de cesantía[19] y que no fue hasta el 6 de octubre de 2009 que fue notificada de estos despidos. Dicha notificación, añadió la FCT, consistió en entregarle personalmente a su Delegada General, la Sra. Irba Batista, un expediente que contenía copia de las cartas de cesantía.[20]

En vista de lo anterior, la FCT concluyó que las notificaciones de las cesantías antes descritas eran defectuosas por contravenir lo establecido en el Artículo 37.04 de la Ley Núm. 7, *supra*, y por violentar el debido proceso de ley. Esto, pues alega que dicho articulado exige que las cesantías decretadas sean notificadas simultáneamente al empleado y a la organización sindical que lo representa mediante comunicaciones escritas separadas e independientes. Consecuentemente, solicitó

---

[18] *Véase*, Apéndice del Recurso de Certiorari AC-2010-0018, pág. 3.

[19] Estos despidos entrarían en vigor el 6 de noviembre de 2009. *Véase*, Apéndice del Recurso de Certiorari AC-2010-0018, pág. 95.

[20] *Véase*, Apéndice del Recurso de Certiorari AC-2010-0018, pág. 3.

que se emitiera un interdicto provisional ordenando la revocación de las cartas de cesantías.[21]

El 16 de noviembre de 2009, el Tribunal de Primera Instancia celebró una vista. En la referida audiencia las partes expresaron que no era necesaria la celebración de una vista evidenciaria porque no existía controversia sobre ningún hecho medular, lo que hacía innecesaria la presentación de prueba. Ante ello, el foro primario les ordenó a las partes que redujeran a escrito todos los hechos sobre los cuales no versaba controversia alguna para poder dictar sentencia. Dos (2) días más tarde —el 18 de noviembre de 2009— las partes presentaron una moción cumpliendo con lo ordenado.[22]

Además, ese mismo día la parte demandada presentó una moción intitulada "Moción Urgente Solicitando Desestimación y/o Sentencia Sumaria". En ella, adujo que el Tribunal de Primera Instancia carecía de jurisdicción para adjudicar la presente controversia porque la Ley Núm. 7, *supra*, le confirió jurisdicción primaria exclusiva a la Comisión de Relaciones del Trabajo del Servicio Público, en adelante CRTSP, para atender los asuntos relacionados a las cesantías.[23]

---

[21] *Íd.*, pág. 6.

[22] *Íd.*, págs. 83-86.

[23] *Íd.*, págs. 8-52.

Luego de varios trámites procesales,[24] el 12 de enero de 2010, el Tribunal de Primera Instancia dictó sentencia y declaró No Ha Lugar la moción urgente presentada por la parte demandada. Además, concluyó que las notificaciones de cesantías no fueron realizadas conforme a derecho, por lo que éstas eran nulas y carecían de efectividad por estar reñidas con el debido proceso de ley.

Conforme a ello, el foro primario expidió el interdicto permanente solicitado. Al así hacerlo dejó sin efecto las notificaciones de las certificaciones de antigüedad y las cartas de cesantía notificadas a los empleados representados por la FCT. De igual forma, ordenó el pago de todos los haberes dejados de percibir por los empleados cesanteados desde la fecha en que fueron despedidos.[25]

Inconforme, el 19 de enero de 2010, la parte demandada presentó un recurso de apelación ante el Tribunal de Apelaciones.[26] En dicho recurso alegó que el Tribunal de Primera Instancia erró al declarar sin lugar la moción urgente y al concluir que las cartas de cesantía eran nulas por no haber sido notificadas simultáneamente. Añadió que no procedía conceder el interdicto solicitado por la parte demandante ni dejar sin efecto las cartas de

---

[24] El 7 de diciembre de 2009, la parte demandada presentó ante este foro un recurso de certificación y una moción al amparo de la Regla 28(A) de nuestro Reglamento, 4 L.P.R.A. Ap. XXI-A, R. 28(A). Ambos recursos fueron declarados No Ha Lugar mediante resolución emitida el 16 de diciembre de 2009. *Véase*, Apéndice del Recurso de Certiorari AC-2010-0018, pág. 89.

[25] *Véase*, Apéndice del Recurso de Certiorari AC-2010-0018, pág. 108.

[26] *Íd.*, pág. 109.

cesantía y las certificaciones de antigüedad, máxime cuando éstas últimas no fueron objeto de controversia alguna.[27]

Además, ese mismo día la parte demandada presentó una moción urgente ante el Tribunal de Apelaciones. En ella le solicitó al foro apelativo intermedio que paralizara los efectos de la sentencia apelada hasta que dicho foro atendiera el recurso de apelación presentado.

Luego de evaluar detenidamente los argumentos de ambas partes, el 1 de febrero de 2010, el Tribunal de Apelaciones emitió una resolución mediante la cual concluyó que no procedía dictar la orden de paralización solicitada por los demandados.[28] Asimismo, el 22 de febrero de 2010, el foro apelativo intermedio dictó una sentencia mediante la cual confirmó el dictamen emitido por el Tribunal de Primera Instancia.[29]

No conteste con el referido dictamen, el 1 de marzo de 2010, la parte demandada presentó ante este Tribunal un recurso de apelación acompañado por una moción urgente en auxilio de jurisdicción. En dicho recurso, señaló la comisión del siguiente error:

> **Erró el Tribunal de Apelaciones al confirmar la sentencia del TPI y concluir que las notificaciones de las cesantías cursadas a los empleados y empleadas del DV y del DRD afiliados a la apelada son nulas, al no habérsele notificado simultáneamente de dichas cesantías a la FCT.**

---

[27] *Íd.*, págs. 119-120.

[28] *Íd.*, págs. 219-221.

[29] *Íd.*, págs. 247-285.

Por otro lado, en la moción urgente, la parte demandada solicitó que se paralizaran los efectos de la sentencia dictada por el Tribual de Apelaciones hasta que se atendieran las controversias planteadas en el recurso de apelación. A esos efectos, luego de examinar ambos recursos el 16 de marzo de 2010 emitimos una resolución mediante la cual acogimos el recurso de apelación presentado como uno de *certiorari* y le concedimos a la FCT un término de veinte (20) días para que se expresara en cuanto a lo solicitado. A su vez, ordenamos la paralización de los efectos de la sentencia dictada por el Tribunal de Apelaciones.

Posteriormente, el 2 de diciembre de 2010, emitimos otra resolución mediante la cual ordenamos la consolidación de los casos CT-2010-0001, CT-2010-0002 y AC-2010-0018, por presentar cuestiones comunes de derecho. 32 L.P.R.A. Ap. V, R.38.1. Por ello, y con el beneficio de la comparecencia de todas las partes, procedemos a resolver.

## IV.

En <u>Domínguez Castro, *et als.* v. E.L.A. I, *et als.*</u>, *supra*, adjudicamos la mayoría de las controversias planteadas en los casos consolidados que hoy nos ocupan. En aquella ocasión consolidamos cuatro (4) recursos de certificación[30] en donde varios empleados públicos impugnaron la constitucionalidad de la Ley Núm. 7, *supra*,

_____

[30] A saber: CT-2009-0004; CT-2009-0005; CT-2009-0006; CT-2009-0009.

y cuestionaron sus cesantías a raíz de la implementación de dicho estatuto.

En cuanto a los reclamos de los empleados cesanteados sobre la inconstitucionalidad de la Ley Núm. 7, *supra*, por estar reñida con el debido proceso de ley en su vertiente sustantiva, indicamos que aun cuando los empleados públicos de carrera poseen un interés propietario sobre sus plazas y que ello garantiza la concurrencia de un debido proceso de ley, este derecho de propiedad no es absoluto. "Está supeditado a intereses sociales que se agrupan en el concepto de `poder de razón de estado´ o `police power´". Domínguez Castro, *et als*. v. E.L.A. I, *et als.*, *supra*, págs. 28-29. Pierson Muller I v. Feijoó, 106 D.P.R. 838 (1978); Lupiáñez v. Srio de Instrucción, 105 D.P.R. 696 (1977). *Véase*, Emp. Pur. Des., Inc. v. H.I.E. Tel., 150 D.P.R. 924, 954 (2000). *Véanse además*, Velázquez Velázquez v. E.L.A., 135 D.P.R. 84 (1994); Vázquez v. A.R.Pe., 128 D.P.R. 513 (1991); The Richards Group v. Junta de Planificación, 108 D.P.R. 23 (1978).

Luego, al hacer una exposición histórica y normativa sobre el poder de razón de estado, señalamos que desde 1915 en Pueblo v. García García, 22 D.P.R. 817 (1915), este Tribunal resolvió que los ataques constitucionales a medidas de reglamentación socioeconómica fundamentados en la cláusula de debido proceso de ley –en su vertiente sustantiva– se analizan bajo el crisol de un escrutinio racional. Domínguez Castro, *et als*. v. E.L.A. I, *et als.*,

*supra*, pág. 39 *citando a* J.J. Álvarez González, <u>Derecho Constitucional de Puerto Rico y Relaciones Constitucionales con los Estados Unidos</u>, Bogotá, Temis, 2009, págs. 631-632. Expresamos, además, que la Legislatura –en el ejercicio de su poder de razón de estado– tiene amplia facultad para la reglamentación de carácter económico, siempre y cuando exista una relación real y sustancial entre dicha reglamentación y el objetivo económico que se persigue. Además, la normativa adoptada no debe ser irrazonable, arbitraria o caprichosa. *Íd.* Así, indicamos que al analizar un estatuto de carácter socioeconómico los tribunales tienen que otorgarle gran deferencia a la pieza legislativa que se impugna y presumir su constitucionalidad. De modo que el peso de la prueba recae sobre quien cuestiona su validez. <u>Domínguez Castro, *et als.* v. E.L.A. I, *et als.*</u>, *supra*, pág. 41; <u>Marina Ind. v. Brown</u>, 114 D.P.R. 64 (1983).

Cónsono con lo anterior, resolvimos que la Ley Núm. 7, *supra*, en el contexto de las cesantías que autoriza y promueve, así como la eliminación de unos procesos anteriores a esas cesantías, constituye una acción razonable del Estado dirigida a salvar la solvencia del erario público, por lo que no infringe el debido proceso de ley sustantivo. Ello, a raíz de la emergencia fiscal que originó la aprobación de dicho estatuto y los fines que éste persigue. <u>Domínguez Castro, *et als.* v. E.L.A. I, *et als.*</u>, *supra*, págs. 64-65.

Además, en cuanto a las reclamaciones de los empleados cesanteados sobre la inconstitucionalidad de la Ley Núm. 7, *supra*, por ser contraria al debido proceso de ley en su vertiente procesal, señalamos que el procedimiento de cesantías establecido por dicho estatuto sobrepasa los requisitos establecidos por la normativa jurisprudencial. *Íd.*, págs. 69-70; Rivera Rodríguez & Co. v. Lee Stowell, 133 D.P.R. 881, 888 (1991), y no infringe el referido derecho. A esos efectos, afirmamos que la Ley Núm. 7, *supra*, "le concede al empleado público cesanteado la oportunidad de una vista previa antes de que se le anuncie su cesantía si éste así lo solicita". Domínguez Castro, *et als.* v. E.L.A. I, *et als.*, *supra*, pág. 70.

De igual forma, aunque en los recursos aquí consolidados no se presenta esta controversia, en cuanto a la igual protección de las leyes y la alegada clasificación sospechosa que la Ley Núm. 7, *supra*, implementa, sostuvimos que la diferencia en tratamiento que promueve la aplicación del referido estatuto entre las tres (3) ramas del Gobierno no ofende ni viola la cláusula de la igual protección de las leyes. Esto por razón de que se trata de una clasificación razonable, fundamentada en un interés público legítimo. *Íd.*, pág. 88.

Por su parte, en cuanto a los reclamos de los empleados cesanteados sobre la inconstitucionalidad de la Ley Núm. 7, *supra*, por estar reñida con la cláusula constitucional que prohíbe el menoscabo de obligaciones

contractuales, indicamos que la función del foro judicial consiste en establecer un balance entre el poder de razón de estado para salvaguardar el bienestar y la seguridad de la ciudadanía y el interés de proteger las relaciones contractuales. *Íd.*, págs. 91-92. *Véase, además*, United States Trust Co. v. New Jersey, 431 U.S. 1 (1977); Warner Lambert v. Tribunal Superior, 101 D.P.R. 378 (1973). Añadimos que "la garantía constitucional contra el menoscabo de obligaciones contractuales se activa cuando la modificación afecta adversamente los términos y condiciones esenciales del contrato que principalmente dieron motivo a la celebración [del mismo,] de modo que se frustren las expectativas razonables de las partes". Domínguez Castro, *et als.* v. E.L.A. I, *et als.*, *supra*, pág. 94. *Véase, además*, Allied Structural Steel Co. v. Spannaus, 438 U.S. 234 (1978); City of El Paso v. Simmons, 379 U.S. 497 (1965). Así, una vez determinado que el menoscabo es sustancial, se debe auscultar si la modificación contractual establecida es razonable y necesaria para adelantar un interés público importante en beneficio del bienestar general. Domínguez Castro, *et als.* v. E.L.A. I, *et als.,* *supra*, pág. 95; Bayrón Toro v. Serra, 119 D.P.R. 605 (1987).

Conforme lo anterior, luego de hacer un análisis ponderado y de aplicar la normativa vigente a las circunstancias ante nuestra consideración, resolvimos que el Estado "demostró tener un interés público importante en

adoptar medidas correctivas de forma expedita para atender la crisis fiscal en la [sic] protección del bienestar general de la sociedad". Domínguez Castro, *et als.* v. E.L.A. I, *et als.*, *supra*, pág. 101. Concluimos, además, que la Ley Núm. 7, *supra*, "se adoptó como resultado del ejercicio del poder de razón del Estado para atender una emergencia fiscal que atenta contra el bienestar socioeconómico de la sociedad puertorriqueña", por lo que las cesantías autorizadas y el procedimiento establecido por el referido estatuto no infringen la cláusula constitucional que prohíbe el menoscabo de las obligaciones contractuales. *Íd.*, págs. 102-103.

Finalmente, en cuanto a las reclamaciones de los empleados cesanteados sobre la inconstitucionalidad de la Ley Núm. 7, *supra*, por delegar poderes indebidamente a la Junta de Reestructuración y Estabilización Fiscal, en adelante JREF, expresamos que "nada impide que la Legislatura establezca normas generales que sean amplias y que dejen al administrador un adecuado margen de libertad para complementar las normas legislativas mediante la utilización de un juicio especializado", el cual pueda desarrollarse conforme un análisis, apreciación y discreción administrativa razonable. Domínguez Castro, *et als.* v. E.L.A. I, *et als.*, *supra*, pág. 108-109; Debién v. Junta de Contabilidad, 76 D.P.R. 96 (1954). En ese sentido, añadimos que una delegación de poderes de esta naturaleza será valida

siempre y cuando la ley habilitadora que cree la agencia u organismo administrativo establezca normas adecuadas, pautas, estándares, criterios o principios inteligibles o aquellas garantías o salvaguardas procesales y sustantivas que sirvan de guía a la delegación y que delimiten sus facultades para evitar que las actuaciones de los entes administrativos resulten arbitrarias o caprichosas. Dichos criterios no tienen que ser expresos, pueden surgir, inclusive, del historial legislativo y pueden ser amplios y generales…. (Citas omitidas). <u>Domínguez Castro, *et als.* v. E.L.A. I, *et als.*</u>, *supra*, pág. 107.

Por ello, luego de exponer y analizar los poderes delegados a la JREF por la Ley Núm. 7, *supra*, colegimos que dicha delegación es constitucionalmente válida y no viola el principio constitucional de separación de poderes. Ello, pues el referido estatuto provee unas guías adecuadas que orientan la utilización de ese poder. <u>Domínguez Castro, *et als.* v. E.L.A. I, *et als.*</u>, *supra*, pág. 113.

Esta normativa jurídica es la que hoy reiteramos. Resulta innecesario alterar los pronunciamientos vertidos en <u>Domínguez Castro, *et als.* v. E.L.A. I, *et als.*</u>, *supra.* Máxime cuando los recurridos en los casos aquí consolidados presentaron, en cuanto a las controversias adjudicadas en dicha Opinión, los mismos planteamientos constitucionales atendidos en aquella ocasión. Consecuentemente, resta por considerar los planteamientos aquí esbozados y no adjudicados por <u>Domínguez Castro, *et als.* v. E.L.A. I, *et als.*</u>, *supra.*

**A**

La Sección 17 del Artículo III de la Constitución de Puerto Rico, en lo pertinente, establece lo siguiente:

> No se aprobará ningún proyecto de ley, con excepción de los de presupuesto general, que contenga más de un asunto, el cual deberá ser claramente expresado en su título, y toda aquella parte de una ley cuyo asunto no haya sido expresado en el título será nula. La ley de presupuesto general sólo podrá contener asignaciones y reglas para el desembolso de las mismas. Ningún proyecto de ley será enmendado de manera que cambie su propósito original o incorpore materias extrañas al mismo. Const. E.L.A., *supra*, Art. III, Sec. 17.

Esta sección establece la llamada regla de un solo asunto, la cual exige que toda ley o estatuto aprobado por la Asamblea Legislativa regule una sola materia. Conforme esta regla constitucional, el asunto tratado por la ley debe surgir de su título, de lo contrario la parte de la ley omitida del título se entenderá nula. *Íd.*, *citando a* Dorante v. Wrangler of P.R., 145 D.P.R. 408, 427 (1998). De igual forma, esta regla exige que toda enmienda a la ley sea afín al asunto regulado. *Íd.*

En Laboy v. Corporación Azucarera Saurí & Subirá, 65 D.P.R. 422 (1945), nos expresamos sobre la regla de un solo asunto. En aquella ocasión, mediante la Ley Núm. 26 de 23 de noviembre de 1917, conocida como Ley para Enmendar el Artículo 553 del Código Penal, Derogar el Artículo 554 de dicho Código y para Otros Fines, se introdujo una enmienda de naturaleza civil al Código Penal. En específico, la Sección 3 de dicha ley indicaba lo siguiente:

> Los empleados y dependientes de las empresas y
> establecimientos no exceptuados por esta Ley,
> que presten sus servicios sobre la base de un
> salario anual, mensual, semanal o en cualquier
> otra forma que no sea por jornal o ajuste a un
> tanto alzado, tendrán derecho a un día de
> descanso por cada seis de trabajo, con salario
> íntegro. Laboy v. Corporación Azucarera Saurí &
> Subirá, *supra*, pág. 429.

En virtud de la referida sección, el Sr. José Laboy Montes y el Sr. Juan Laboy Montes presentaron un recurso de apelación en el que adujeron que su patrono, la Corporación Azucarera Saurí & Subirá, no les había honrado los derechos otorgados por esta disposición. Ante estas alegaciones, al exponer la normativa sobre la regla de un solo asunto, expresamos que "el precepto constitucional … requiere que el asunto de una ley sea claramente expresado en el título". Laboy v. Corporación Azucarera Saurí & Subirá, *supra*, pág. 425. Ello es así debido a que el título de una ley "tiene por objeto informar al público en general y a los legisladores en particular, el asunto que es objeto de la ley, de forma que el primero pueda oponerse a su aprobación si la considera lesiva a sus intereses y los segundos estén en condiciones de emitir su voto conscientes del asunto objeto de legislación". *Íd.*, págs. 425-426.

En apoyo de nuestras expresiones sobre la regla de un solo asunto, señalamos que en Martínez v. People of Puerto Rico, 46 F.2d 427, 429 (1er. Cir. 1931), el Tribunal Federal de Circuito de Apelaciones para el Primer Circuito indicó que no debía entenderse como que "el título debe

contener una minuciosa descripción de la ley. Basta que exprese en términos generales cuál es su objeto, Rodríguez v. P.R. Ry., Lt. & Power Co., 30 D.P.R. 931 [(1922)], siempre que, desde luego, no induzca a error. … El título debe ser un poste indicador de lo que contiene la ley". Laboy v. Corporación Azucarera Saurí & Subirá, *supra*, pág. 426. *Véase, además*, Posados v. Warner, B. & Co., 279 U.S. 340 (1929).

Así, pues, al analizar integralmente el título de la Ley Núm. 26, *supra*, su Sección 3 y el cuerpo normativo en donde estaba siendo insertada dicha enmienda, resolvimos que el asunto regulado por la referida sección era de carácter puramente civil y "[constituía] una desviación del asunto de la ley original". Laboy v. Corporación Azucarera Saurí & Subirá, *supra*, pág. 430. Por ello la declaramos nula.

> [Q]uien lee el título de la Ley Núm. 26 de 23 de noviembre de 1917, difícilmente podrá sospechar que a un artículo del Código Penal se le haya adicionado una materia de naturaleza estrictamente civil. El título de la Ley de 1917 en ninguna forma indica que fuera el objeto de la enmienda que el patrono concediese a su empleado un día de descanso con salario íntegro por cada seis de trabajo. Laboy v. Corporación Azucarera Saurí & Subirá, *supra*, pág. 429.

Recientemente, en Herrero, *et als.* v. Alcaraz Emmanuelli, Srio., 2010 T.S.P.R. 95, 179 D.P.R. ___ (2010), nos expresamos ampliamente sobre la regla de un solo asunto y expusimos su trayectoria. En esta ocasión estaba en controversia la validez constitucional de una cláusula contenida en la Ley Núm. 42 de 1 de agosto de

2005, mediante la cual se sujetó la efectividad de dicha ley a la aprobación de la Resolución Conjunta Núm. 445 sobre el Presupuesto General 2005-2006.

En específico, en cuanto a la trayectoria de la regla, señalamos que fue introducida en Puerto Rico "por el artículo 34 de la Carta Orgánica Jones de 1917, como parte del detallado proceso legislativo incluido en dicha ley" y que su propósito es impedir prácticas fraudulentas, facilitar la labor legislativa y hacer imposible que grupos minoritarios incorporen sus proposiciones favoritas en una sola pieza de legislación y se unan para obtener una mayoría artificial, la cual no existiría si las distintas proposiciones se consideraran separadamente. Herrero, *et als.* v. Alcaraz Emmanuelli, Srio., *supra*, pág. 15, *citando a* J. Trías Monge, Historia Constitucional de Puerto Rico, San Juan, Editorial de la Universidad de Puerto Rico, 1982, Vol. III, pág. 159; Escuela de Administración Pública, La Nueva Constitución de Puerto Rico, Edición facsimilar de la primera edición 1954, San Juan, Editorial de la Universidad de Puerto Rico, 2005, págs. 402-04; 4 Diario de Sesiones de la Convención Constituyente de Puerto Rico 2584 (1961). Además, indicamos que la regla de un solo asunto se incorporó en la Constitución de Puerto Rico para prevenir las concesiones mutuas en la aprobación de las leyes o el

llamado "logrolling",[31] y que esta práctica "contraviene el diseño legislativo ya que cada una de las propuestas independientes probablemente no lograrían una mayoría legislativa por méritos propios". Herrero, et als. v. Alcaraz Emmanuelli, Srio., supra, pág. 17. Cónsono con lo anterior, expresamos que el "logrolling" puede manifestarse a través de los llamados "riders"[32] y que la regla de un solo asunto está "encaminada a evitar los riders, a evitar que se hagan enmiendas extrañas al propósito de los proyectos y que se adultere el fin de un proyecto aprobando subrepticiamente algo que la Asamblea Legislativa no dejaba aprobar, no debió haber permitido que se aprobara de haber conocido la intención".[33] 2 Diario de Sesiones de la Convención Constituyente 896 (1961).

---

[31] El "logrolling" es una práctica legislativa a través de la cual grupos minoritarios de legisladores combinan, en un solo proyecto de ley, distintas propuestas incongruentes entre sí, con el propósito de que al momento de la votación de dicha medida, ésta obtenga una mayoría artificial proveniente de la unión de esos grupos. Herrero, et als. v. Alcaraz Emmanuelli, Srio., 2010 T.S.P.R. 95, pág. 16, 179 D.P.R. ___ (2010). Vease, además, N.J. Singer & J.D.S. Singer, Statutes and Statutory Construction, 7th Ed., West, 2009, Vol. 1A, sec. 17.1, pág. 7.

[32] Los "riders" constituyen disposiciones de ley no favorecidas por la mayoría legislativa y no relacionadas con el asunto principal atendido en la legislación. Sin embargo, "son añadidas o `montadas´ en proyectos de ley [que] por su aceptación pública o por su necesidad para el buen funcionamiento del gobierno", son aprobados posteriormente. Herrero, et als. v. Alcaraz Emmanuelli, Srio., supra, pág. 17. Véanse, además, Singer & Singer, op. cit., págs. 7-8; J.J. Álvarez González, Derecho Constitucional de Puerto Rico y Relaciones Constitucionales con los Estados Unidos, Bogotá, Editorial Temis S.A., 2009, pág. 244.

[33] Se arguye, además, que la inclusión de "riders" en la legislación afecta el poder de veto del Ejecutivo. En ese sentido, ante una pieza legislativa que contenga disposiciones "montadas" el Primer Ejecutivo tendría

"que escoger entre aprobar una ley necesaria para el funcionamiento del gobierno, la cual incluye una disposición incongruente con el asunto principal de la ley y que desfavorece, o vetar la ley en su totalidad. El ejemplo por antonomasia de una ley susceptible de que le

Por su parte, en cuanto a la relación directa exigida por la regla de un solo asunto y que debe existir entre el título de una ley y el asunto que regula, señalamos que en múltiples ocasiones hemos resuelto que el propósito de esta relación "es informar al público en general y a los legisladores en particular del asunto del cual es objeto la ley, de manera que se impida la inclusión de materia *incongruente y extraña*". (Énfasis nuestro). Herrero, *et als.* v. Alcaraz Emmanuelli, Srio., *supra*, pág. 19; Dorante v. Wrangler of P.R., *supra*; Cervecería Corona, Inc. v. Junta de Salario Mínimo, 98 D.P.R. 801 (1970). Aclaramos, que dicha regla no "requiere que el título constituya un índice detallado del contenido de la ley, sino meramente que sea un hito indicador del asunto cubierto por la misma". Herrero, *et als.* v. Alcaraz Emmanuelli, Srio., *supra*, pág. 19; Pueblo v. Pérez Méndez, 83 D.P.R. 228, 230 (1961), *citando a* Sunland Biscuit Company, Inc. v. Junta de Salario Mínimo, 68 D.P.R. 371, 380 (1948); Rodríguez v. Corte, 60 D.P.R. 919, 922 (1942). *Véanse, además,* Laboy v. Corporación Azucarera Sauri & Subira, *supra*, pág. 426; Rodríguez v. P.R. Ry., Lt. &

---

sean añadidos "riders" es la Resolución del Presupuesto General, pues la aprobación de ésta es necesaria para el funcionamiento de todas las dependencias del gobierno, por lo que generalmente es aprobada. Es por esta razón que en Puerto Rico, y en varios estados de Estados Unidos, existe una disposición específica que establece que, aun cuando la medida del Presupuesto puede versar sobre varios asuntos, sólo puede contener asignaciones de fondos y reglas para su desembolso". Herrero, et als. v. Alcaraz Emmanuelli, Srio., *supra*, pág. 18. *Véanse, además*, Const. E.L.A., *supra*, Art. III, Sec. 17; El Pueblo v. Foote, Juez, 48 D.P.R. 492 (1935).

Power Co., *supra*; Martínez v. People of Puerto Rico, *supra*.

En ese sentido, apuntalamos que la regla de un solo asunto no está diseñada

> como subterfugio para destruir legislación válida, sino como garantía de que el proceso legislativo se realice de forma transparente, de manera que cada proyecto de ley se discuta y se analice a cabalidad antes de ser aprobado.
>
> Por lo tanto, al examinarse la validez de una ley a la luz de la regla de un sólo asunto, es necesario auscultar todas sus disposiciones para determinar si éstas se relacionan entre sí y son afines con el asunto que se expresa en su título. Cervecería Corona v. Junta de Salario Mínimo, *supra*, pág. 812. Lo que comprende "un sólo asunto" se interpreta liberalmente, sin dejar de lado el propósito y objetivo de la exigencia constitucional. En ese tenor, "un estatuto puede comprender todas las materias afines al asunto principal y todos los medios que puedan ser justamente considerados como accesorios y necesarios o apropiados para llevar a cabo los fines que están propiamente comprendidos dentro del asunto general". Herrero, *et als*. v. Alcaraz Emmanuelli, Srio., *supra*, págs. 20-21, *citando a* R.E. Bernier & J.A. Cuevas Segarra, Aprobación e Interpretación de las Leyes en Puerto Rico, Segunda Edición, San Juan, Publicaciones JTS, 1987, pág. 81.

Acorde con lo anterior, resolvimos que la cláusula contenida en la Ley Núm. 42, *supra*, mediante la cual se condicionó la efectividad de dicha ley a la aprobación posterior de la Resolución Conjunta Núm. 445 sobre el Presupuesto General 2005-2006, era constitucionalmente válida pues la Asamblea Legislativa posee la facultad inherente de sujetar la validez de un estatuto a una

condición o un evento futuro.[34] <u>Herrero, *et als.* v. Alcaraz Emmanuelli, Srio.</u>, *supra*, pág. 24. "Dicha condición puede tratarse de una contingencia, tal como el resultado de una elección, la aprobación de una enmienda constitucional o la aprobación de otra ley". *Íd*.

Nuestra decisión estuvo basada en la interdependencia habida entre ambas piezas legislativas y la relación directa de los asuntos regulados. *Íd*., pág. 32. No obstante, aclaramos que la potestad de la Asamblea Legislativa para condicionar leyes no es irrestricta. Así, "una condición que sujete la vigencia de una ley a una contingencia que sea extraña o no esté razonablemente relacionada con la ley en cuestión, podría violar la regla de un solo asunto". (Énfasis nuestro). *Íd*., pág. 26.

**B**

> Las leyes deben interpretarse de acuerdo con reglas bien conocidas, que a veces se llaman `cánones de interpretación´ con respecto a los cuales se han escrito tomos enteros, y jueces competentes han trabajado día y noche, preparando centenares de dictámenes y explicándolos y comentándolos. Una de las primeras y más importantes de todas estas reglas, es de averiguar y cerciorarse de la intención de la legislatura y seguir dicha intención. … Por supuesto, si los tribunales o jueces no se fijan en el sentido de la ley, ni prestan atención al texto del estatuto, entonces no pueden ver la intención de la legislatura. Pero muchas veces dicha intención les salta a la vista, cuando puede verse claramente, simplemente mirando. Los tribunales no deben nunca dar a una ley una interpretación forzada o desnatural, si es posible evitarlo. Es fácil hacer desparecer la intención de la legislatura,

---

[34] La Ley Núm. 42 de 1 de agosto de 2005 no advino efectiva dado el veto de bolsillo que impartió el Gobernador a la Resolución Núm. 445 sobre el Presupuesto General 2005-2006.

> mediante una refinada interpretación, o anular
> las claras disposiciones de una ley, mediante
> cavilaciones hechas con ese fin.  Pero, los
> tribunales y los jueces deberían evitar tales
> prácticas, empleando para ello todos los medios
> posibles.  Theodore Roosevelt expresa la opinión
> general del público con respecto a esta
> cuestión, en las siguientes enérgicas palabras:
> Una exagerada sutileza en las decisiones, puede
> dar por resultado el mismo daño para la
> comunidad, como si el juez fuese realmente
> depravado. (Citas omitidas). Pueblo v. Ferraris,
> 15 D.P.R. 813, 834-835 (1909) (Voto Particular
> del Juez MacLeary).

El lenguaje claro y explícito de un estatuto no debe ser tergiversado, mucho menos malinterpretado o sustituido.  La función de la Rama Judicial no es legislar sino interpretar las leyes aprobadas por la Rama Legislativa y constatar que no estén reñidas con la Constitución.  Marbury v. Madison, 5 U.S. (1 Cranch) 137 (1803).  Const. E.L.A., *supra*, Art. V, Sec. 4; E.L.A. v. Aguayo, 80 D.P.R. 552, 595-602 (1958); Marimón v. Pelegrí, 1 D.P.R. 225, 229 (1902).

Para cumplir cabalmente con la tarea antes mencionada, la cual encuentra sus orígenes en uno de los pilares de todo sistema republicano de gobierno –la Separación de Poderes– el legislador ha consagrado en nuestro ordenamiento jurídico ciertas normas o reglas de interpretación.  Es aquí donde el Artículo 14 del Código Civil, 31 L.P.R.A. § 14, juega un papel medular, pues éste constituye uno de los postulados más básicos de la hermenéutica judicial.

El principio de hermenéutica contenido en el Artículo 14 de nuestro Código Civil, *supra*, enuncia que "cuando la

ley es clara y libre de toda ambigüedad, la letra de ella no debe ser menospreciada bajo el pretexto de cumplir con su espíritu". Este principio nace de la "regla de oro" en la interpretación estatutaria: buscar y poner en vigor la intención legislativa. Mason v. White Star Bus Line, 53 D.P.R 337, 340 (1938); Pueblo v. Del Moral *et al.*, 16 D.P.R. 653, 655 (1910); Vivaldi v. Mariani *et al.*, 10 D.P.R. 444, 446-447 (1906); R. Elfren Bernier y J. Cuevas Segarra, Aprobación e Interpretación de las Leyes en Puerto Rico, 2da. Ed., San Juan, Pubs. J.T.S., 1987, T. 1, pág. 267.

En armonía con lo anterior, en un sinnúmero de ocasiones hemos indicado que "ante el lenguaje claro, explícito y libre de toda ambigüedad o duda de un estatuto, no cabe menospreciar la letra de la ley bajo el pretexto de cumplir su espíritu, máxime cuando el espíritu o intención del estatuto y su letra, son la misma cosa". Pueblo v. Castro Muñiz, 118 D.P.R. 625, 650 (1987); Román v. Superintendente de la Policía, 93 D.P.R. 685, 688 (1966). *Véanse, además,* Rullán Rivera v. Autoridad de Energía Eléctrica, 2010 T.S.P.R. 109, 179 D.P.R. ___ (2010); Garriga Villanueva v. Mun. de San Juan, 2009 T.S.P.R. 103, 176 D.P.R. ___ (2009); Villamil Development v. C.R.I.M., 171 D.P.R. 392 (2007); Muñoz v. Ten General, 167 D.P.R. 297 (2006); López Rivas v. Rodríguez, 162 D.P.R. 345 (2004); Pueblo v. Álvarez Rodríguez, 154 D.P.R. 566 (2001); Santiago Meléndez v. Superintendente de la

Policía de Puerto Rico, 151 D.P.R. 511 (2000); Rodríguez v. Aut. de Tel. de P.R., 145 D.P.R. 595 (1998); Gobernador de P.R. v. Alcalde de Juncos, 121 D.P.R. 522 (1988); Municipio de Mayagüez v. Rivera, 113 D.P.R. 467 (1982). Ahora bien, con el fin de propiciar el resultado querido por el legislador, la exégesis judicial no debe circunscribirse al examen aislado de una sola disposición legal.  Por el contrario, el análisis debe ser hecho tomando en consideración la totalidad del estatuto y su contexto.

> Téngase en cuenta, que la intención legislativa de una ley no debe buscarse en una frase aislada o en una de sus secciones; sino en el contexto de todo el estatuto, tomando en cuenta el propósito seguido por el legislador.  Por eso, un artículo de una ley no debe interpretarse aisladamente, sino considerando la ley en su totalidad.  Bernier y Cuevas Segarra, op. cit., pág. 245.

Sin embargo, si la aplicación literal de un estatuto nos lleva a un resultado absurdo o ello conlleva un resultado opuesto a la verdadera intención o propósito del legislador, la literalidad puede ser ignorada. Morell Corrada v. Ojeda, 151 D.P.R. 864, 877-878 (2000); Clínica Juliá v. Srio. de Hacienda, 76 D.P.R. 509, 520 (1954). "Siendo así, cuando existan disposiciones dudosas en un estatuto, éstas deben interpretarse a la luz de las demás disposiciones y atribuirles el sentido que resulte del conjunto de todas". Departamento de Hacienda v. Telefónica, 164 D.P.R. 195 (2005). Véanse, además, Ojeda v. El Vocero de P.R., 137 D.P.R. 315, 335 (1994); Álvarez

& Pascual, Inc. v. Secretario de Hacienda, 84 D.P.R. 482, 489-490 (1962); Pueblo v. Sucn. Junghanns, 73 D.P.R. 648, 652-653 (1952).

Así pues, un buen ejemplo de la normativa antes esbozada y del análisis concienzudo que debe emplearse a la hora de identificar e implementar la intención legislativa plasmada en un estatuto lo encontramos en Oficina del Comisionado de Seguros de P.R. v. Integrand, 2008 T.S.P.R. 94, 174 D.P.R. ___ (2008). En aquella ocasión, nos vimos precisados a interpretar el alcance del Artículo 2.220 del Código de Seguros, 26 L.P.R.A. § 222, a los fines de determinar si la Oficina del Comisionado de Seguros estaba obligada a celebrar una vista cuando una parte afectada por una orden emitida previamente por dicha oficina así lo solicitaba.

Luego de analizar el lenguaje utilizado por el Artículo 2.220 del Código de Seguros, supra,[35] y el

---

[35] El artículo 2.220 del Código de Seguros, 26 L.P.R.A. § 222, rige todo lo concerniente al proceso de vistas en los procedimientos administrativos que se ventilan ante la Oficina del Comisionado de Seguros. El artículo dispone:

"(1) El Comisionado celebrará las siguientes:

(a) Vistas requeridas por disposición de este título.

(b) Vistas consideradas necesarias por el Comisionado para fines que caigan dentro del alcance de este título.

(c) Vistas solicitadas por cualquier persona perjudicada por algún acto, amenaza de acto, informe, promulgación, regla, reglamento u orden del Comisionado.

(2) Toda solicitud para una vista deberá ser por escrito, deberá especificar los extremos en que la persona que la solicita ha sido perjudicada y los fundamentos en que habrá de basar su solicitud. El Comisionado celebrará la vista así solicitada dentro de sesenta días después de

contexto en el que fue adoptado, resolvimos que dicho articulado no exigía ni obligaba la celebración de una vista, según lo alegado por los peticionarios. Al así hacerlo, señalamos que

> [a]l interpretar el enunciado general de este artículo, lo debemos hacer en armonía con las disposiciones de los incisos posteriores. Por eso, aun cuando el enunciado general establece que el Comisionado "celebrará las siguientes" vistas, lo que parece ser un mandato, una vez evaluada esta disposición en conjunto con los incisos posteriores que la modifican, advertimos que lo que parecía ser obligatorio, no lo es. Nos explicamos.
>
> En primer lugar, el inciso 1(a) del Artículo 2.220 regula las "vistas requeridas" por disposición del Código de Seguros. Este inciso hace obligatoria la celebración de una vista cuando alguna disposición del Código de Seguros ordena celebrar vistas. Dicho inciso claramente alude a vistas "requeridas" por el estatuto. Adviértase sin embargo, que es el adjetivo "requeridas" contenido en el inciso 1(a) el que establece la obligatoriedad de la celebración de dichas vistas, y no la palabra "celebrará" contenida en el enunciado general.
>
> Por otro lado, las vistas a las que se refiere el inciso 1(b) son discrecionales. Lo que disipa las dudas en cuanto a la discreción del Comisionado para celebrarlas es que el inciso particular establece claramente que se refiere a las vistas "consideradas necesarias por el Comisionado".
>
> En otras palabras, los incisos (a) y (b) del Artículo 2.220 regulan dos clases de vistas. La primera (Artículo 2.220(a)) es una vista de carácter obligatorio ordenada por el propio Código de Seguros en otras de sus disposiciones. El segundo tipo de vistas (Artículo 2.220(b)), es una vista discrecional, cuya celebración dependerá de la determinación que haga el propio Comisionado sobre si es o no conveniente llevarla a cabo. La celebración de estas vistas se enmarca en el ejercicio de la discreción de

recibir la solicitud, a menos que se posponga de común acuerdo".

este funcionario.  Oficina del Comisionado de Seguros de P.R. v. Intergrand, *supra*, págs. 11-12.

Otro ejemplo reciente de la exégesis judicial antes descrita lo encontramos en Medina Sánchez v. Swiss Chalet, Inc., 2010 T.S.P.R. 21, 178 D.P.R. ___ (2010).  En esta ocasión tuvimos que determinar si al amparo de la Ley Núm. 130,[36] y el Reglamento del Negocio de la Construcción,[37] el D.A.Co. tiene jurisdicción para ordenarle a una desarrolladora indemnizar a un comprador de un apartamento por la disminución en la cabida del mismo.  Ello, pues los documentos de promoción y la escritura de compraventa reflejaban una cabida mayor a la que finalmente tasó la propiedad.

Al resolver la controversia examinamos el lenguaje contenido en los Artículos 10(c)(6), 10(h)(1) y 11, de la Ley Núm. 130, *supra*, y en las secciones 14.13, 15 y 20 del Reglamento del Negocio de la Construcción, *supra*. Concluimos que estas disposiciones legales específicamente facultan al D.A.Co. con jurisdicción para atender las querellas presentadas por compradores en contra de desarrolladores en las cuales se alegue haber sufrido daños y perjuicios por defectos de construcción o por la falsa representación sobre la unidad vendida.  Medina Sánchez v. Swiss Chalet, Inc., *supra*, págs. 5-9.  Incluso,

---

[36] Ley Núm. 130 de 13 de junio de 1967, 17 L.P.R.A. § 502 *et seq.*, conocida como Ley de la Oficina del Oficial de Construcción.

[37] Reglamento para Regular las Distintas Actividades que se Llevan a cabo en el Negocio de la Construcción de Viviendas Privadas en Puerto Rico, Reglamento Núm. 2268 del D.A.Co. de 16 de septiembre de 1977.

al atender las alegaciones de la recurrida sobre la adecuacidad del término "aproximada" contenido en el folleto promocional del proyecto, examinamos su significado según definido por el Diccionario de la Real Academia Española y resolvimos que "el área neta habitable de 950 pies cuadrados no es aproximada a un área [de] 1,022 pies cuadrados" y que se trataba de "una diferencia de 72 pies cuadrados, lo cual no corresponde a lo que una persona promedio entendería que se acerca más o menos a 1,022 pies cuadrados". *Íd.*, pág. 9.

Finalmente, al disponer del asunto, señalamos que "la táctica de tergiversar las cabidas de los apartamentos que están a la venta constituye una práctica nociva para la industria de la construcción en Puerto Rico, pues resulta perjudicial para los compradores que adquieren una propiedad confiando en lo que el desarrollador les señala" y que dicha práctica se ejercía "amparándose en una interpretación acomodaticia de la Ley de Condominios".[38] *Íd.*, pág. 10.

### C

El procedimiento para implementar el plan de cesantías adoptado por la Ley Núm. 7, *supra*, se encuentra en el Artículo 37.04(b) del referido estatuto. Por su importancia, lo transcribimos en su totalidad.

**Artículo 37.04.-Procedimiento.**

(b)        Cesantías.

---

[38] 31 L.P.R.A § 1291 *et seq.*

(1) En vista del estado de emergencia fiscal, la escasez de recursos fiscales, la gravedad de los problemas que enfrentamos y la urgencia requerida para corregir los problemas fiscales, se exime de agotar medidas tales como reubicación de personal, readiestramiento de empleados, disfrute de vacaciones acumuladas, disfrute de licencia sin sueldo, reducción de jornada de trabajo o descensos, previo a instrumentar las cesantías.

(2) Las Agencias notificarán la terminación a todo empleado que a la fecha de la vigencia de esta Ley tenga un nombramiento transitorio o irregular, por lo que no será necesario observar, en cuanto a éstos, el criterio de antigüedad. La notificación escrita que a esos efectos las Agencias envíen, le apercibirá al empleado de su derecho de solicitar revisión de la decisión de la Agencia, ante la CASARH, en conformidad a lo dispuesto por el Artículo 13, sección 13.14, de la Ley Núm. 184 del 3 de agosto de 2008 [sic], y su reglamento. La notificación se hará mediante entrega a la mano o por correo certificado con acuse de recibo a la dirección que obra en los expedientes de la Agencia.

(3) Las cesantías de los empleados con nombramiento permanente o de carrera se efectuarán observando exclusivamente el criterio de antigüedad, de modo que sean cesanteados en primer término aquellos que tengan menor antigüedad.

(4) A los fines de determinar la antigüedad de empleados afectados se considerarán todos los servicios prestados por los empleados afectados en el servicio público, independientemente de las

disposiciones de los convenios colectivos, reglamentos, cartas circulares y otros documentos normativos.

(5) Se crea la JREF, la cual estará compuesta por el Presidente del BGF, el cual dirigirá la Junta, el Secretario del Trabajo, el Secretario del Departamento de Desarrollo Económico y Comercio de Puerto Rico, el Secretario del Departamento de Hacienda, y la Directora Ejecutiva de la OGP. Sus miembros, en el desempeño de esta encomienda, no habrán de recibir remuneración adicional a la que reciben por el desempeño de sus labores en sus agencias o departamentos.

(6) Además de las facultades otorgadas por este Capítulo III, la JREF tendrá todas las facultades necesarias y convenientes para descargar la encomienda aquí asignada, incluyendo pero sin limitarse a la de realizar o encomendar, a las agencias o departamentos que están a su cargo, que se realicen los estudios que sean necesarios; requerir a las Agencias la información necesaria para realizar su encomienda; asesorar al Gobernador y a las Agencias en todo lo relativo a los empleados a ser cesanteados; evaluar, aprobar o rechazar peticiones de empleados para reducir la jornada de los puestos que ocupan; llevar a cabo reuniones entre sí y con los jefes de las Agencias; y reclutar de forma temporal, mediante destaque, el personal necesario para realizar la encomienda. Su Presidente tendrá la facultad, además, para asignar y/o poner a la disposición de la JREF todo recurso del BGF que sea necesario para descargar sus obligaciones bajo este Capítulo

III. La encomienda de la JREF, y su duración finalizará una vez se cumpla el objetivo de la ley.

(7) La JREF habrá de determinar la cantidad global de empleados a ser cesanteados, en conformidad con las disposiciones del Artículo 2 de esta Ley y en armonía con la necesidad de asegurar la continuidad y calidad de los servicios gubernamentales, dentro de un término no mayor de cinco (5) días calendario de iniciada la Fase II.

(8) Las Agencias identificarán y certificarán a la JREF la antigüedad de cada uno de sus empleados, dentro de un término no mayor de quince (15) días calendario de iniciada la Fase II.

En el mismo término, las Agencias certificarán por escrito a sus empleados afectados, individualmente, su fecha de antigüedad según surge de sus récords. En el caso de empleados miembros de una unidad apropiada representada por una organización sindical se notificará, además, a dicha organización sindical. Dicha certificación se notificará a los empleados, y, además, de ser el caso, a la organización sindical, mediante entrega a la mano o por correo certificado con acuse de recibo, a la dirección que obra en los expedientes de las Agencias y apercibiéndole del derecho que tiene el empleado a exponer y fundamentar por escrito su versión en cuanto a su fecha de antigüedad. La fecha de notificación será la de su entrega o envío.

(9) El empleado, y de ser el caso, éste a través de su organización sindical, tendrá un término no mayor de treinta

(30) días calendario, a partir de la fecha de la notificación, para presentar por escrito a la Agencia, evidencia documental oficial emitida por la autoridad o entidad gubernamental competente ("evidencia documental fehaciente") que refute la antigüedad que le ha sido certificada. Para ello utilizará el formulario que para esos fines será provisto por su respectiva Agencia, el cual completará y someterá a su propia Agencia, con copia de la evidencia documental fehaciente que refute la fecha de antigüedad notificada por la Agencia.

(10) En la eventualidad de que el empleado afectado no refute o no presente, dentro del término aquí dispuesto, evidencia documental fehaciente que sostenga su posición, la antigüedad a ser utilizada será aquella que le fue notificada por la Agencia. Dicha antigüedad será concluyente para todo propósito relacionado con este Capítulo III.

(11) En la eventualidad de que el empleado afectado presente, dentro del término aquí dispuesto, evidencia documental fehaciente que controvierta la antigüedad que le ha sido notificada, la Agencia no tomará determinación final sobre la antigüedad sin antes darle la oportunidad de tener una vista previa.

(12) La Agencia notificará al empleado su determinación final que sobre la antigüedad tome, y, además, de ser el caso, a la organización sindical, en un término no mayor de treinta (30) días calendario, apercibiéndole de su derecho de solicitar revisión de dicha determinación, conforme a lo dispuesto a esos fines en [los

incisos] (13) y (14), del Artículo 37.04 (b) de esta Ley. Dicha notificación se hará a los empleados, y, además, de ser el caso, a la organización sindical, mediante entrega a la mano o por correo certificado con acuse de recibo, a la dirección que obra en los expedientes de las Agencias. La fecha de notificación será la de su entrega o envío. No obstante, la presentación del recurso de revisión no habrá de paralizar las cesantías; disponiéndose, no obstante, que en el caso que el empleado prevalezca, se le restituirá a su puesto, efectivo a la fecha de su cesantía.

(13) El empleado afectado podrá solicitar revisión de la determinación final tomada por la Agencia, solamente en cuanto a su antigüedad ante la CASARH, en conformidad a lo dispuesto por el Artículo 13, sección 13.14, de la Ley Núm. 184 del 3 de agosto de 2004, y su reglamento.

(14) Aquellos empleados que sean miembros de una unidad apropiada, afiliados o no a una organización sindical, podrán revisar la determinación [final tomada] por la Agencia, solamente en cuanto a su antigüedad, mediante una petición que a esos efectos presenten a los árbitros de la Comisión, creada al amparo de la Ley Núm. 45 del 25 de febrero de 1998, en un término no mayor de treinta (30) días calendario del recibo de la notificación de la Agencia.

(15) La Agencia notificará las cesantías con al menos treinta (30) días calendario de anticipación a la fecha de su efectividad, mediante comunicación escrita dirigida al empleado y, además, de ser el caso, a la organización

sindical, indicando la fecha de efectividad de la misma. La notificación se realizará conforme al Artículo 37.04(b), inciso (12) de este Capítulo III.

(16) Las cesantías a efectuarse conforme a esta Fase II serán llevadas a cabo de forma escalonada, a partir del 1 de julio del 2009 y durante todo el año fiscal 2009-2010. La JREF establecerá el orden en que se llevarán a cabo las cesantías y al determinar este orden tomará en cuenta las medidas necesarias para asegurar que las Agencias afectadas puedan continuar operando apropiadamente luego de las cesantías.

(17) El hecho de que algún empleado afectado haya presentado, en fecha anterior a la fecha de efectividad de esta Ley, alguna querella, reclamación o impugnación cuestionando su clasificación, no será obstáculo para decretar su cesantía haciendo uso de la clasificación objetada o impugnada. No obstante, de resolverse tal querella, reclamación o impugnación de forma favorable al empleado y, por consiguiente, cambie su clasificación a una en la cual lleve a cabo funciones esenciales conforme a lo dispuesto en el Artículo 37.02, la Agencia dejará sin efecto su cesantía, retroactivo a la fecha de su cesantía.

El Artículo 37.04(b) de la Ley Núm. 7, *supra*, contempla, a través de sus diecisiete (17) incisos, los requisitos de notificación con los cuales tienen que cumplir todas las cesantías decretadas en virtud de dicho estatuto.

En cuanto a la terminación de empleados cuyo nombramiento a la fecha de vigencia de la Ley Núm. 7, *supra*, era uno de carácter transitorio o irregular, el inciso (2) del Artículo 37.04(b) de este estatuto dispone, primeramente, que no es necesario observar el criterio de antigüedad. A renglón seguido, señala que la carta de cesantía debe apercibirle al empleado sobre su derecho a solicitar revisión de la decisión de la Agencia ante la Comisión Apelativa del Sistema de Administración de Recursos Humanos, en adelante CASARH, y que dicho apercibimiento debe ser hecho en virtud de lo dispuesto en el Artículo 13, sección 13.14, de la Ley Núm. 184 de 3 de agosto de 2004 y su reglamento. Esta carta de cesantía se notificará personalmente o enviándose por correo certificado con acuse de recibo a la dirección que obra en los expedientes de la Agencia. Artículo 37.04(b)(2) de la Ley Núm. 7, *supra*.

Por su parte, en cuanto a las cesantías de los empleados de carrera, el inciso (3) del Artículo 37.04(b) de la Ley Núm. 7, *supra*, indica que éstas se efectuarán observando el criterio de antigüedad, de modo que sean cesanteados –en primer término– aquellos empleados de menor antigüedad. Asimismo, el inciso (15) del Artículo 37.04(b) del referido estatuto dispone que la Agencia tiene que informar los despidos con al menos treinta (30) días de anticipación a la fecha en que éstos serán efectivos. Esta decisión de la Agencia se informará

mediante comunicación escrita dirigida al empleado y, además, a la organización sindical que lo representa. A su vez, la referida misiva contendrá la fecha de efectividad del despido y un apercibimiento sobre su derecho a solicitar revisión de la decisión de la Agencia ante la CRTSP. Artículos 37.04(b)(12) y (14) de la Ley Núm. 7, *supra.* Esta carta de cesantía también se notificará personalmente o enviándose por correo certificado con acuse de recibo a la dirección que obra en los expedientes de la Agencia y su fecha de notificación será la de su entrega o envío. Artículo 37.04(b)(12) de la Ley Núm. 7, *supra.*

Como podemos observar, del anterior párrafo se desprenden los requisitos exigidos para las cesantías de los empleados de carrera decretadas en virtud de la Ley Núm. 7, *supra*. Así, los incisos (12) y (15) del Artículo 37.04(b) de la Ley Núm. 7, *supra*, exigen lo siguiente: (1) que la cesantía decretada por la Agencia sea informada mediante comunicación escrita; y (2) que esta comunicación escrita: (a) le sea remitida al empleado cesanteado con al menos treinta (30) días de anticipación a la fecha de efectividad de su despido; (b) le informe al empleado la fecha en que su despido será efectivo; y (c) le aperciba al empleado sobre su derecho a solicitar revisión de la decisión de la Agencia.

Además, en las instancias en que el empleado de carrera despedido esté representado por una organización

sindical, ésta tendrá que ser informada de la cesantía mediante una comunicación escrita aparte de la misiva enviada al empleado despedido y su contenido deberá reflejar la información requerida por el Artículo 37.04(b) de la Ley Núm. 7, *supra*.[39] En cuyo caso, el apercibimiento sobre el derecho a solicitar revisión descrito en el párrafo anterior deberá indicar que el foro apropiado para ejercer este derecho lo es la CRTSP.[40]

Por consiguiente, toda carta de cesantía notificada en detrimento de los requisitos antes esbozados será defectuosa.

Ahora bien, en materia de notificaciones defectuosas <u>Molini Gronau v. Corporación de Puerto Rico para la Difusión Pública</u>, *et als.*, 2010 T.S.P.R. 140, 179 D.P.R. ___ (2010), resulta altamente importante. Allí detallamos el remedio al que tiene derecho una parte que ha sido notificada de su cesantía defectuosamente.

En aquella ocasión, luego de ser notificada de su cesantía mediante comunicación escrita, la peticionaria presentó una demanda sobre interdicto preliminar y permanente, sentencia declaratoria y compensación por daños y perjuicios ante el Tribunal de Primera Instancia.

---

[39] Al señalar "y, además, de ser el caso, a la organización sindical", los incisos (12) y (15) del artículo 37.04(b) de la Ley Núm. 7, *supra*, claramente establecen la necesidad de remitirle a la unión una comunicación escrita aparte de la misiva dirigida al empleado cesanteado.

[40] En <u>Báez Rodríguez v. Gobernador</u>, *et als.*, 2010 T.S.P.R. 87, pág. 12, 179 D.P.R. ___ (2010), resolvimos que el Tribunal de Primera Instancia comparte jurisdicción con la CRTSP para atender toda controversia que no se limite a la antigüedad de un empleado cesanteado.

En su demanda la peticionaria alegó que el plan de cesantías implementado por la Corporación violaba los postulados del debido proceso de ley, el principio de mérito y otros derechos reconocidos por el Reglamento de la Corporación. Por su parte, la Corporación adujo que el foro con jurisdicción para atender la controversia instada lo era su Comité de Apelaciones y no el tribunal de instancia. Ello, pues la decisión de implementar el plan de cesantías fue decretada por el Presidente de la Corporación y no por su Junta de Directores. Molini Gronau v. Corporación de Puerto Rico para la Difusión Pública, et als., supra, págs. 3-4.

Evaluados los argumentos de ambas partes, el Tribunal de Primera Instancia dictó sentencia declarando con lugar el interdicto solicitado. Señaló, primeramente, que la decisión de implementar el plan de cesantías fue tomada por la Junta de Directores de la Corporación y que ello implicaba que el foro con jurisdicción para atender la controversia lo era el judicial y no el Comité de Apelaciones de la Corporación, como se había notificado a la peticionaria en la carta de cesantía. A raíz de ello, el foro primario entendió que la carta de cesantía fue notificada defectuosamente y dejó sin efecto el despido de la peticionaria sin adjudicar los méritos de las alegaciones vertidas en la demanda. Íd., págs. 4-5.

Inconforme, la Corporación acudió ante el Tribunal de Apelaciones y reprodujo las alegaciones vertidas ante el

Tribunal de Primera Instancia. En la alternativa, alegó que el foro primario erró al dictar sentencia y dejar sin efectos las cesantías decretadas pues lo que procedía era atender los méritos de la demanda y no la revocación automática de los despidos. *Íd*., págs. 5-6.

Posteriormente, el Tribunal de Apelaciones dictó sentencia y revocó el dictamen emitido por el Tribunal de Primera Instancia. Concluyó que la cesantía de la peticionaria fue decretada por el Presidente de la Corporación, por lo que el foro con jurisdicción para revisar la decisión de despido lo era el Comité de Apelaciones de la Corporación y no el tribunal de instancia. Además, en equidad, el foro apelativo intermedio le otorgó un término de treinta (30) días a la peticionaria para que acudiera ante el referido Comité, los cuales comenzarían a contar desde que se notificara la sentencia del foro apelativo intermedio. *Íd*., pág. 6.

Insatisfecha, la peticionaria acudió ante este Tribunal. En su recurso de *certiorari*, el cual fue acompañado por una moción en auxilio de jurisdicción, la peticionaria alegó que el Tribunal de Apelaciones erró al revocar el interdicto concedido por el Tribunal de Primera Instancia. Luego de evaluar las posiciones de ambas partes, señalamos que el plan de cesantías fue implementado a raíz de una decisión de la Junta de Directores de la Corporación y no de su Presidente, por lo que el foro con jurisdicción para atender la controversia

presentada lo era el judicial y no el Comité de Apelaciones de la Corporación. *Íd.*, págs. 7-13.

Como consecuencia de lo anterior, resolvimos que la carta de cesantía cursada a la peticionaria constituyó una notificación defectuosa pues le informó erróneamente que el foro con jurisdicción para revisar su despido lo era el Comité de Apelaciones de la Corporación. *Íd.*, pág. 13. Sin embargo, debido a que la peticionaria acudió oportunamente ante el foro con jurisdicción para adjudicar sus reclamos –Tribunal de Primera Instancia– añadimos que el foro primario incidió al decretar la nulidad de la cesantía notificada defectuosamente y conceder el interdicto solicitado sin haber atendido los méritos de la demanda presentada. Por ello, devolvimos el caso para que adjudicara la controversia en su totalidad. *Íd.*, pág. 16.

Así, pues, conforme a la norma pautada en <u>Molini Gronau v. Corporación de Puerto Rico para la Difusión Pública</u>, *et als.*, *supra*, en las instancias en que las cartas de cesantía hayan sido notificadas defectuosamente el remedio a otorgarse es el siguiente: la parte perjudicada podrá ejercer su derecho de revisión ante el foro con jurisdicción para ello, sin sujeción a los términos aplicables. En estas instancias la parte perjudicada por la notificación defectuosa estará sujeta a

la doctrina de incuria,[41] por lo que deberá ejercer su derecho diligentemente. *Íd.*, págs. 14-16.

Por el contrario, cuando la parte notificada defectuosamente de su cesantía haya presentado oportunamente su recurso de revisión ante el Tribunal de Primera Instancia, éste no podrá invalidar ipso facto la cesantía decretada por la agencia como tampoco podrá conceder automáticamente el remedio solicitado. Mas bien, deberá atender los méritos de la reclamación presentada y hacer una adjudicación del derecho sustantivo. *Íd.*, págs. 16-17.

**D**

Mediante la Ley Núm. 43 de 21 de junio de 1988, según enmendada, 25 L.P.R.A. §§ 331-331bb, la Asamblea Legislativa creó el Cuerpo de Bomberos de Puerto Rico. Este Cuerpo tiene como obligación "prevenir y combatir fuegos, salvar vidas, garantizar a los ciudadanos en general una protección adecuada contra incendios, así como determinar, una vez ocurrido el siniestro, el origen y causas del incendio".[42] 25 L.P.R.A. § 331a. Este Cuerpo

---

[41] "La doctrina de incuria se ha definido como `la dejadez o negligencia en el reclamo de un derecho, los cuales en conjunto con el transcurso del tiempo y otras circunstancias que causan perjuicio a la parte adversa, opera como un impedimento en una corte de equidad´". Molini Gronau v. Corporación de Puerto Rico para la Difusión Pública, et als., 2010 T.S.P.R. 140, págs. 14-15, 179 D.P.R. ___ (2010).

[42] Conforme al inciso (2) del artículo 3 de la Ley Núm. 184 de 3 de agosto de 2004, según enmendada, conocida como Ley para la Administración de los Recursos Humanos en el Servicio Público del Estado Libre Asociado de Puerto Rico, 3 L.P.R.A. §§ 1461-1468p, el Cuerpo de Bomberos de Puerto Rico es catalogado como un Administrador Individual. Reglamento de personal para el servicio de carrera, Reglamento Núm. 4439 del Cuerpo de Bomberos de Puerto Rico de 7 de mayo de 1991, pág. 2.

está integrado por "el Jefe de Bomberos, Jefes Auxiliares de Bomberos,[43] Comandantes de Bomberos, Capitanes, Tenientes, Sargentos, Cabos, Bomberos, Bomberos Auxiliares, Bomberos Voluntarios e Inspectores". 25 L.P.R.A. § 331b. Estos rangos se podrán "crear, eliminar, consolidar y modificar … según surjan las necesidades del servicio". *Íd*.

El Cuerpo de Bomberos es dirigido por un Jefe de Bomberos, "quien [es] nombrado por el Gobernador de Puerto Rico con el consejo y consentimiento del Senado" y desempeñará su cargo "por un término de seis (6) años o hasta que su sucesor sea nombrado". *Íd*. Ésta es "la persona encargada de la administración del Cuerpo de Bomberos". 25 L.P.R.A. § 331d. Entre sus deberes y poderes se encuentran "adoptar … reglas y reglamentos expresando en detalle la organización funcional y administración del Cuerpo de Bomberos" y "las obligaciones, responsabilidades y conducta de sus miembros". 25 L.P.R.A. §§ 331c(a), 331g.

_____

[43] El Artículo 6 de la Ley Núm. 43 de 21 de junio de 1988, según enmendada, conocida como Ley del Cuerpo de Bomberos de Puerto Rico, 25 L.P.R.A. § 331d, define y crea el puesto de Jefes Auxiliares. Sobre ello, este artículo indica lo siguiente:

> "Se crean por la presente los puestos de Jefes Auxiliares de Bomberos, los que responderán directamente al Jefe de Bomberos y servirán en dichas posiciones a discreción de éste. Los Jefes Auxiliares estarán en el Servicio de Confianza. Dichos Jefes Auxiliares de Bomberos tendrán a su cargo las áreas operacionales que por reglamento se establezcan y serán responsables de la administración y supervisión del personal a su cargo. Cualquier miembro regular del Cuerpo de Bomberos podrá ser nombrado Jefe Auxiliar. Cuando esto ocurra, retendrá su rango permanente y una vez cesen en sus funciones como Jefes Auxiliares regresarán a su rango permanente y al sueldo que al momento le correspondería de haber estado ejerciendo el puesto".

El Jefe de Bomberos establecerá, además, "… el orden de sucesión en caso de su ausencia, incapacidad o muerte". 25 L.P.R.A. § 331b. En cuanto al referido orden, la Orden Especial 2001-3 del Cuerpo de Bomberos, emitida el 15 de julio de 2001, tiene como propósito establecer el orden de mando (Orden de Sucesión) en los casos donde, por cualquier circunstancia, el Jefe en propiedad esté ausente. Además, en la eventualidad en que por alguna razón de peso el jefe responsable de tomar el mando no desee hacerlo, éste le notificará al jefe siguiente en turno para que se haga cargo.

Así, pues, en las instancias en que el Jefe de Bomberos se encuentre ausente será el Jefe Auxiliar del Negociado de Extinción quien, en primer lugar, le sustituya. En segundo lugar le sustituirá el Jefe Auxiliar del Negociado de Administración; en tercer lugar el Jefe Auxiliar de Adiestramiento; y en cuarto lugar el Jefe Auxiliar de Prevención.

A su vez, la Ley Núm. 184 de 3 de agosto de 2004, según enmendada, conocida como Ley para la Administración de los Recursos Humanos en el Servicio Público del Estado Libre Asociado de Puerto Rico, 3 L.P.R.A. §§ 1461-1468p, define el interinato como los servicios "temporeros que rinde un empleado de carrera en un puesto cuya clasificación es superior a la del puesto para el cual tiene nombramiento oficial, en virtud de una designación escrita de parte de la autoridad nominadora o su

representante autorizada y en cumplimiento de las demás condiciones legales aplicables". 3 L.P.R.A. § 1461.

Cuando un empleado de carrera rinde servicios temporeros en calidad de interinato, éste asume el cargo superior con todas las obligaciones, responsabilidades y facultades que dicho cargo conlleva. Ahora, en cargos que requieran el consejo y consentimiento del Senado el interinato queda sin efecto "al levantarse la sesión ordinaria de la Asamblea Legislativa en curso o, en su defecto, la siguiente, al comienzo del interinato, a menos que se efectúe antes del nombramiento en propiedad. Esa y no más es la expectativa de continuidad que puede tener un funcionario incumbente bajo una cláusula de continuidad". Nogueras v. Hernández Colón, 127 D.P.R. 638, 651 (1991).

## V.

### A

En los recursos CT-2010-0001 y CT-2010-0002 los recurridos SBUPR y SPU alegaron que la Ley Núm. 7, *supra*, es inconstitucional debido a que fue aprobada en abierta violación a la Sección 17 del Artículo III de la Constitución de Puerto Rico, la cual prohíbe que se apruebe una ley que contenga más de un solo asunto. A esos efectos, indicaron que la Ley Núm. 7, *supra*, es un estatuto incongruente, que combina legislación sobre materias y que deroga "una serie de leyes, reglamentos y políticas públicas establecidas, especialmente cuando ha desmantelado *de facto* agencias cuyas políticas públicas

expresamente consignadas en estatutos no han sido oficialmente derogadas". No les asiste la razón.

La Ley Núm. 7, *supra*, es un estatuto especial de naturaleza económica y su propósito es salvar el crédito de Puerto Rico dada la emergencia fiscal por la cual atraviesa el Estado. Artículo 2 de la Ley Núm. 7, *supra*. Además, el título del referido estatuto revela claramente que el único asunto[44] o materia regulado es las finanzas del erario público. En consecución de ello, el Legislador adoptó un método compuesto, el cual se desprende también del título de la referida ley y consiste en declarar un estado de Emergencia Fiscal y establecer un plan integral para estabilizar la emergencia fiscal declarada.

Asimismo, debido a que la Ley Núm. 7, *supra*, es un estatuto de corte económico y que el asunto regulado lo es las finanzas del erario público, ello implica –naturalmente– que dicho estatuto tendrá un alcance amplio. De igual forma, esto presupone que se emplearán mecanismos de naturaleza económica, tales como medidas de ingresos, de reducción de gastos y medidas de corte financiero, sin necesidad que todas ellas sean expresadas minuciosamente en el título de la ley. Herrero, *et als.* v. Alcaraz Emanuelli, Srio., *supra*, pág. 19; Laboy v. Corporación

---

[44] El diccionario de la Real Academia Española nos define el término "asunto" como: (1) Materia de que se trata; (2) Tema o argumento de una obra; (3) Aquello que se representa en una composición pictórica o escultórica; (4) Negocio, ocupación, quehacer. Real Academia Española, Diccionario de la Lengua Española, Ed. Espasa, Madrid, 2001, pág. 235.

Azucarera Saurí & Subirá, *supra*; Martínez v. People of Puerto Rico, *supra*.

Sin embargo, aun cuando la Ley Núm. 7, *supra*, adoptó un acercamiento dual en consecución de su asunto, ello no equivale a concluir que dicho estatuto es inconstitucional por haber sido aprobado en violación a la Sección 17 del Artículo III de la Constitución de Puerto Rico, *supra*. Todo lo contrario. Ante la evaluación judicial de una ley al amparo de la regla de un solo asunto, el método escogido por el Legislador para alcanzar el asunto regulado por dicho estatuto no debe ser razón para decretar su inconstitucionalidad. Ello, siempre y cuando exista una relación directa entre el título de la ley y el asunto regulado, y que éste no introduzca materias incongruentes entre sí o induzca a error. Herrero, *et als.*, v. Alcaraz Emanuelli, Srio., *supra*, pág. 19. *Véase, además,* Laboy v. Corporación Azucarera Saurí & Subirá, *supra*, pág. 426.

El título de la Ley Núm. 7, *supra*, es lo suficientemente descriptivo con relación al asunto que regula y la forma en que ha de regularlo. Una mera lectura de éste revela que existe una relación directa entre el título del referido estatuto, el asunto que regula y los métodos escogidos para regularlo. Aquí, contrario a lo ocurrido en Laboy v. Corporación Azucarera Saurí & Subirá, *supra*, el asunto regulado no introduce materias ajenas o incongruentes entre sí, como tampoco

induce a error. Quien lee el título de la Ley Núm. 7, *supra*, fácilmente deduce que se trata de un estatuto económico y que éste regula asuntos de la misma índole, todos vinculados entre sí. Herrero, *et als.*, v. Alcaraz Emanuelli, Srio., *supra*, pág. 19. Además, la regla de un solo asunto no está diseñada "como subterfugio para destruir legislación válida, sino como garantía de que el proceso legislativo se realice de forma transparente, de manera que cada proyecto de ley se discuta y se analice a cabalidad antes de ser aprobado". Herrero, *et als.*, v. Alcaraz Emanuelli, Srio., *supra*, pág. 20.

Consecuentemente, sostenemos la constitucionalidad de la Ley Núm. 7, *supra*. Ésta no fue aprobada en violación a la Sección 17 del Artículo III de la Constitución de Puerto Rico, *supra*, pues comprende "todas las materias afines al asunto principal y todos los medios que puedan ser justamente considerados como accesorios y necesarios o apropiados para llevar a cabo los fines que están propiamente comprendidos dentro del asunto general" de dicho estatuto. Herrero, *et als.*, v. Alcaraz Emanuelli, Srio., *supra*, pág. 20.

De igual forma, colegimos que la Ley Núm. 7, *supra*, no contiene disposición legal alguna que haya sido "montada" o incorporada mediante la práctica indeseada del "logrolling". Más bien, este estatuto representa el vehículo jurídico escogido por nuestra Asamblea Legislativa para atender un solo asunto:

la necesidad de lograr la estabilización fiscal del Gobierno de Puerto Rico y proteger su crédito mediante: (a) nuevas medidas [de] ingresos y de mejor fiscalización; (b) medidas de control y reducción de gastos; (c) medidas fiscales y de financiamiento [para] cubrir insuficiencias presupuestarias en lo que las medidas de ingresos y control de gastos surten efecto, financiar los costos asociados con la implantación de las medidas de reducción de gastos, y evitar impactos adversos en el Fondo General por la precariedad fiscal de algunas corporaciones públicas y municipios. Artículo 2 de la Ley Núm. 7, *supra*.[45]

**B**

En los recursos CT-2010-0001 y AC-2010-0018, los recurridos SBUPR y FCT alegan que los despidos de sus miembros son nulos toda vez que las cartas de cesantía no fueron notificadas simultáneamente. En específico, aducen que las referidas cartas son defectuosas por haber sido notificadas en detrimento del principio de simultaneidad contenido en el Artículo 37.04(b) de la Ley Núm. 7, *supra*, y que ello acarrea la nulidad de sus cesantías. No les asiste la razón.

El procedimiento de notificación de las cesantías decretadas a raíz de la Ley Núm. 7, *supra*, y los requisitos con los cuales éstas tienen que cumplir están descritos en el Artículo 37.04(b) del referido estatuto.

---

[45] Somos conscientes de nuestras expresiones en Herrero, *et als.*, v. Alcaraz Emanuelli, Srio., *supra*, págs. 33-34, cuando señalamos que "si la Ley 42 o una medida similar a esa, hubiese sido incluida en el texto de la Resolución del Presupuesto General, dicha disposición probablemente sería inconstitucional en tanto se trataba de un recaudo y, por disposición constitucional, el Presupuesto sólo puede contener asignaciones y reglas para su desembolso". Ello, sin embargo, no altera nuestra decisión en el caso de autos. Contrario a lo que ocurre con el Presupuesto General, el asunto de la Ley Núm. 7, *supra*, no está limitada constitucionalmente a sólo incluir reglas y asignaciones de desembolsos. Más bien, incluye todos los métodos diseñados para atender la crisis fiscal del gobierno.

Así, como mencionáramos anteriormente, toda cesantía decretada al amparo del referido estatuto tiene que: (1) ser informada mediante comunicación escrita; y (2) dicha comunicación escrita tiene que: (a) serle remitida al empleado cesanteado con al menos treinta (30) días de anticipación a la fecha de efectividad de su despido; (b) informarle al empleado la fecha en que su despido será efectivo; y (c) apercibirle al empleado cesanteado sobre su derecho a solicitar revisión de la decisión de la agencia.

Incluso, cuando el empleado cesanteado esté representado por una organización sindical, dicha organización tendrá que ser informada de la cesantía mediante una comunicación escrita aparte de la enviada al empleado despedido. En cuyo caso, el apercibimiento sobre su derecho a solicitar la revisión de su cesantía deberá indicar que el foro apropiado para ejercer este derecho lo es la CRTSP, con la cual el Tribunal de Primera Instancia comparte jurisdicción. *Véase*, Báez Rodríguez v. Gobernador, *et als.*, 2010 T.S.P.R. 87, pág. 12, 179 D.P.R. ___ (2010).

Como podemos apreciar, el Artículo 37.04(b) de la Ley Núm. 7, *supra*, -analizado en su totalidad- no requiere que las cesantías decretadas al amparo de dicho estatuto sean notificadas simultáneamente al empleado despedido y a la organización sindical que lo representa. Su lenguaje es claro, explícito y no presenta ambigüedad alguna. Por

ello, no debe ser malinterpretado bajo el pretexto de cumplir con su espíritu, "máxime cuando el espíritu o intención del estatuto y su letra son la misma cosa". Pueblo v. Castro Muñiz, *supra*, págs. 625, 650; Román v. Superintendente de la Policía, *supra*, págs. 685, 688. *Véase, además,* Artículo 14 del Código Civil, 31 L.P.R.A. § 14. Más bien, en cuanto a requisitos temporales, el Artículo 37.04(b) sólo exige que la carta de cesantía sea notificada con al menos treinta (30) días de anticipación a la fecha en que el despido será efectivo y que la fecha de notificación será la de su entrega o envío. Artículo 37.04(b)(12) y (15) de la Ley Núm. 7, *supra*.

Además, contrario a lo ocurrido en Oficina del Comisionado de Seguros de P.R. v. Integrand, *supra*; y en Medina Sánchez v. Swiss Chalet, Inc., *supra*, el Artículo 37.04(b) no contiene término o concepto alguno que -tan siquiera- insinúe que la intención del Legislador fue exigir que las cartas de cesantía fuesen notificadas simultáneamente. Precisamente, por no contener término o concepto alguno que así lo exija, este Tribunal debe abstenerse de incorporar en el Artículo 37.04(b) requisitos de notificación adicionales.

En otras palabras, no podemos caer ante la tentación de interpretar un estatuto de forma acomodaticia para incorporar en éste una voluntad ajena a la que el Legislador contempló, tentación demostrada por la parte recurrida en Medina Sánchez v. Swiss Chalet, Inc., *supra*.

Aquí, a diferencia de Oficina del Comisionado de Seguros de P.R. v. Integrand, *supra*, y de Medina Sánchez v. Swiss Chalet, Inc., *supra*, no hay término o concepto cuyo significado sea medular para resolver la controversia presentada. El texto de la Ley Núm. 7, *supra*, no refleja que la voluntad del Legislador haya sido exigir que las cartas de cesantía tengan que ser notificadas simultáneamente al empleado cesanteado y a la unión que lo representa. De haberlo querido, así lo hubiese expresado.

Ahora bien, somos conscientes que en el ámbito judicial este Tribunal ha resuelto que los dictámenes judiciales deben ser notificados simultáneamente a todas las partes involucradas en el pleito, de modo que no se generen dos (2) términos distintos para revisar dicho dictamen ante un foro de mayor jerarquía. Caro v. Cardona, 158 D.P.R. 592, 599-600 (2003); Medio Mundo, Inc. v. Rivera, 154 D.P.R. 315, 331 (2001); Rodríguez Mora v. García Lloréns, 147 D.P.R. 305, 310 (1998). A raíz de ello, la nueva Regla 65.3 de Procedimiento Civil del 2009, 32 L.P.R.A. Ap. V., R. 65.3, contempla explícitamente la norma de simultaneidad. Informe de Reglas de Procedimiento Civil, 2008, pág. 752 ("[e]l inciso (a) de la Regla 65.3[,] se enmendó para indicar que la notificación a las partes por el Secretario debe hacerse **en la misma fecha**"). (Énfasis nuestro).

Sin embargo, esta norma no debe aplicarse análogamente a los procedimientos de notificación

contemplados por el Artículo 37.04(b) de la Ley Núm. 7, *supra*. Ello se debe a que la norma de simultaneidad contenida en la Regla 65.3 de Procedimiento Civil, *supra*, es una de naturaleza procesal aplicable exclusivamente dentro del cauce judicial. Por ello, de resolver lo contrario, incurriríamos en un acto de legislación judicial en claro detrimento de la doctrina de Separación de Poderes.

Como consecuencia de lo anterior, al resolver que la Ley Núm. 7, *supra*, no exige que las cartas de cesantía sean notificadas simultáneamente, entendemos que el término de treinta (30) días de anticipación antes descrito comenzará a calcularse, como bien indica el inciso (12) del Artículo 37.04(b) ("La fecha de notificación será la de su entrega o envío"), desde la fecha en que la carta de cesantía es notificada a la última parte que debe ser notificada, ya sea mediante entrega personal o desde que se envía por correo certificado con acuse de recibo. De esta forma evitamos incurrir en la práctica poco favorecida de incorporar por fíat judicial requisitos que el Legislador nunca contempló.

Por su parte, en el recurso AC-2010-0018 la FCT alegó que no fue notificada de los despidos de sus miembros mediante comunicación escrita distinta a la enviada a los empleados que representa. A esos efectos, la FCT indicó que su notificación fue defectuosa porque sólo se le hizo

entrega de un expediente que contenía copias de las cartas de cesantías remitidas a los empleados despedidos. Le asiste la razón.

Ciertamente, el hacerle entrega a la FCT de un expediente que sólo contenía copias de las cartas de cesantía notificadas a los empleados despedidos que ésta representa –sin que dichas copias reflejen la fecha en que se notificó a la organización sindical– constituye una notificación defectuosa. Los peticionarios debieron cursarle a la unión una comunicación escrita aparte, acompañada o no de anejos, que cumpliera con todos los requisitos contemplados por el Artículo 37.04(b) de la Ley Núm. 7, *supra*, e informara claramente la fecha en que la organización sindical fue notificada.[46] Sólo así la FCT hubiese sido debidamente notificada de las cesantías decretadas. Ello no ocurrió.

No obstante, a pesar que la FCT fue notificada defectuosamente de las cesantías de los empleados que representa, este defecto en la notificación no tiene el alcance que la FCT le atribuye. Las cesantías decretadas a raíz de la Ley Núm. 7, *supra*, no son nulas por haber sido notificadas defectuosamente. Más bien, cuando se notifica defectuosamente una carta de cesantía lo que procede es que la parte perjudicada ejerza su derecho a

---

[46] Entendemos, además, que esta notificación a la organización sindical puede efectuarse mediante la entrega de copias de las cartas de cesantía enviadas a los empleados. Ello, siempre y cuando se desprenda de dicha notificación la fecha en que se le notificó a la unión. De esta forma el término para acudir al foro con jurisdicción para revisar la decisión de la agencia podrá calcularse adecuadamente.

revisar la decisión administrativa ante el foro con jurisdicción para ello, sin sujeción a los términos dispuestos por ley, siempre y cuando no incurra en incuria. *Molini Gronau v. Corporación de Puerto Rico para la Difusión Pública, et als.*, *supra*, págs. 14-16.

En esta ocasión, aun cuando la FCT fue notificada defectuosamente de las cesantías de sus miembros, ésta acudió oportunamente ante el Tribunal de Primera Instancia para revisar la decisión de las agencias. Más aun, el foro primario, en vez de conceder automáticamente el remedio solicitado, actuó conforme nuestras expresiones en *Molini Gronau v. Corporación de Puerto Rico para la Difusión Pública, et als.*, *supra*. Así, atendió los méritos de la controversia presentada y dictó sentencia conforme al derecho sustantivo. Incluso, concedió el remedio solicitado.

Consecuentemente, concluimos que el anterior trámite procesal no refleja que el derecho de revisión de los empleados cesanteados haya sufrido lesión alguna como consecuencia de la notificación defectuosa que se le hiciera a la organización sindical que los representa. Todo lo contrario. Aun cuando la FCT fue notificada defectuosamente de las cesantías de sus miembros, éstos han gozado y ejercido diligentemente todas las garantías que emanan del debido proceso de ley y siempre tuvieron disponible el foro con jurisdicción para ejercer su derecho de revisión.

A igual conclusión llegamos en cuanto a las alegaciones de SPU en el recurso CT-2010-0002 sobre las notificaciones de sus cesantías con menos de treinta (30) días de anticipación a la fecha de efectividad de su despido. Aun cuando coincidimos con los planteamientos esbozados por SPU y entendemos que dichas cartas de cesantía fueron notificadas defectuosamente, los recurridos acudieron diligente y oportunamente ante el Tribunal de Primera Instancia para ejercer su derecho de revisión y sus reclamos han sido atendidos, mas no desestimados por falta de jurisdicción. Molini Gronau v. Corporación de Puerto Rico para la Difusión Pública, *et als.*, *supra*. Por ello, ni su derecho a revisión ni las garantías que emanan del debido proceso de ley –a las cuales tienen perfecto derecho– han sido lesionadas por las notificaciones defectuosas.

### C

En el recurso CT-2010-0001 los recurridos SBUPR alegaron que las cartas de cesantías notificadas son nulas debido a que fueron firmadas por el Jefe de Bomberos Interino, Sr. Pedro A. Vázquez Montañez, quien alegadamente no tenía capacidad jurídica para ello por no haber sido nombrado por el Gobernador ni confirmado por el Senado para el puesto de Jefe de Bomberos del Cuerpo de Bomberos de Puerto Rico. No les asiste la razón.

Como mencionamos anteriormente, todo empleado público de carrera en un puesto cuya clasificación es superior a

la del puesto para el cual tiene nombramiento oficial ejerce ese puesto superior en calidad de interinato. Así, cuando el empleado asume el cargo en calidad de interinato, éste también asume todas las obligaciones, responsabilidades y facultades que dicho cargo conlleva. Este interinato no podrá subsistir más allá del final de la sesión legislativa siguiente a la fecha en que se produjo la vacante que se llenó mediante el interinato. Nogueras v. Hernández Colón, *supra*; Hernández Agosto v. López Nieves, 114 D.P.R. 601 (1983).

En esta ocasión, el señor Vázquez Montañez asumió la jefatura del Cuerpo de Bomberos de Puerto Rico en calidad de interinato el 16 de septiembre de 2009, día en que surgió la vacante y meses antes de la fecha en que las cartas de cesantía fueron notificadas. Asimismo, el señor Vázquez Montañez fungió como jefe de bomberos interino hasta el 3 de marzo de 2010, cuando su sucesora, la Sra. Carmen G. Rodríguez Díaz, fue confirmada por el Senado para ocupar el puesto. Ello ocurrió, como podemos apreciar, antes que finalizara la primera sesión legislativa ordinaria. Nogueras v. Hernández Colón, *supra*; Hernández Agosto v. López Nieves, *supra*. *Véase, además,* Cámara de Representantes, R. de la C. 118, 12 de enero de 2009, 16ta. Asamblea Legislativa, 1era sesión ordinaria, Regla 18, Sec. 18.2.[47]  Por consiguiente,

---

[47] La Sección 18.2 de la Regla 18 del Reglamento de la Cámara de Representantes dispone que la primera sesión legislativa comienza el segundo lunes de enero y termina el 30 de junio del mismo año.

resulta forzoso concluir que el señor Vázquez Montañez tenía plena capacidad jurídica para firmar las cartas de cesantía impugnadas, por lo que éstas no son nulas.

**D**

Finalmente, en el recurso CT-2010-0002 los recurridos SPU alegaron que varios de sus miembros no fueron notificados de forma alguna de sus despidos, que ello los ha dejado en un estado de indefensión y que se les ha privado de un interés propietario en abierta violación al procedimiento establecido en el Artículo 37.04(b) de la Ley Núm. 7, *supra*.

Según hemos expresado, el Artículo 37.04(b) de la Ley Núm. 7, *supra*, claramente indica que la agencia notificará las cesantías mediante comunicación escrita y de la forma antes expuesta. Ello, alegadamente, no ocurrió en esta ocasión.

Sin embargo, por no contar con prueba fehaciente que revele si los empleados despedidos y, de ser el caso, la organización sindical que los representa, fueron o no notificados de sus cesantías, procede que devolvamos el expediente al Tribunal de Primera Instancia para que reciba prueba al respecto. Así, de no haber sido notificados, el foro primario deberá ordenar su notificación según lo aquí pautado. De lo contrario, si el tribunal de instancia encuentra que los empleados

---

Además, habrá una segunda sesión que comienza el tercer lunes de agosto y termina el martes previo al tercer jueves del mes de noviembre.

despedidos y la organización sindical que los representa fueron notificados de sus cesantías, deberá dictar sentencia de conformidad con esta Opinión.

## VI.

Por los fundamentos antes expuestos, colegimos que la Ley Núm. 7 de 9 de marzo de 2009, según enmendada, conocida como Ley Especial Declarando Estado de Emergencia Fiscal y Estableciendo Plan Integral de Estabilización Fiscal para Salvar el Crédito de Puerto Rico, es constitucional en todos los aspectos cubiertos por esta Opinión. Resolvemos, además, que el Artículo 37.04(b) del referido estatuto no exige que las cartas de cesantía sean notificadas simultáneamente.

De igual forma, resolvemos que los incisos (12) y (15) del Artículo 37.04(b) de la Ley Núm. 7, *supra*, requieren que las cesantías decretadas a raíz de dicho estatuto sean notificadas a la organización sindical que representa al empleado despedido mediante una comunicación escrita aparte de la comunicación notificada al empleado. Finalmente, resolvemos que el Sr. Pedro A. Vázquez Montañez estaba plenamente facultado para firmar las cartas de cesantía notificadas.

En virtud de lo anterior, declaramos No Ha Lugar las solicitudes de *injunction* en los recursos CT-2010-0001 y CT-2010-0002, y revocamos la sentencia dictada por el Tribunal de Apelaciones en el caso AC-2010-0018.

Devolvemos el expediente CT-2010-0002 al Tribunal de Primera Instancia según lo antes expresado.

Se dictará sentencia de conformidad.


                                        Edgardo Rivera García
                                            Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Sindicato de Bomberos Unidos de Puerto Rico<br>Recurrida<br><br>v.<br><br>Cuerpo de Bomberos de Puerto Rico; Pedro Vázquez Montáñez, Jefe de Bomberos Interino; Estado Libre Asociado de Puerto Rico; Guillermo Somoza, Secretario de Justicia<br>Peticionarios | |
| Servidores Públicos Unidos de Puerto Rico/AFSCME; Concilio 95 en representación de sus Unionados<br>Recurridos<br><br>v.<br><br>Estado Libre Asociado de Puerto Rico; Departamento de Educación, *et als.*<br>Peticionarios | CT-2010-0001<br>CT-2010-0002<br>AC-2010-0018 |
| Federación Central de Trabajadores<br>Recurrida<br><br>v.<br><br>Departamento de Vivienda; Departamento de Recreación y Deportes; Estado Libre Asociado de Puerto Rico<br>Peticionarios | |

SENTENCIA

San Juan, Puerto Rico, a 26 de enero de 2011.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte íntegra de la presente, se declara No Ha Lugar las solicitudes de *injunction* en los recursos CT-2010-0001 y CT-2010-0002, y se revoca la sentencia dictada por el Tribunal de Apelaciones en el caso AC-2010-0018. Se

devuelve el expediente CT-2010-0002 al Tribunal de Primera Instancia según lo antes expresado.

Así lo pronunció y manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Presidente señor Hernández Denton disiente con la siguiente expresión:

El Juez Presidente señor Hernández Denton disiente sin Opinión escrita y se reafirma en las expresiones vertidas en su Opinión Disidente en el caso Domínguez Castro v. E.L.A., res. 2 de febrero de 2010, 2010 T.S.P.R. 11, que en esencia pauta la norma de Derecho aplicable a las controversias medulares de este caso.

La Jueza Asociada señora Fiol Matta disiente sin opinión escrita. La Juez Asociada señora Rodríguez Rodríguez disiente del curso mayoritario en este caso. Se reafirma además, en lo expresado en su Opinión disidente en Domínguez Castro v. E.L.A. I, et als., res. 2 de febrero de 2010, 2010 T.S.P.R. 11, donde se resolvió, fundamentalmente, el Derecho aplicable a la controversia de epígrafe.

Aida Ileana Oquendo Graulau
Secretaria del Tribunal Supremo